J-A19031-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| GREGORY SCOTT HOPKINS, | : | |
| | : | |
| Appellant | : | No. 964 WDA 2014 |

Appeal from the Judgment of Sentence entered on February 26, 2014
in the Court of Common Pleas of Beaver County,
Criminal Division, No. CP-04-CR-0000580-2012

BEFORE: BENDER, P.J.E., JENKINS and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED AUGUST 31, 2015**

Gregory Scott Hopkins ("Hopkins") appeals from the judgment of sentence entered following his conviction of third-degree murder. We affirm.

In its Opinion, the trial court summarized the facts underlying the instant appeal, which we incorporate as though fully restated herein. Trial Court Opinion, 8/26/14, at 67-70. Briefly, we observe the following facts.

In 1979, 23-year-old Janet Walsh ("Walsh") was found dead in her apartment, with her hands tied behind her back and her nightgown raised so that she was naked from the waist down. A top sheet had been placed over the body. Monaca Police Officer Andrew Gall ("Officer Gall") and Pennsylvania State Trooper Richard Matas ("Trooper Matas") responded to

the scene. During the investigation, police discovered that Walsh had been romantically involved with Hopkins.

The case remained unsolved until 2010, when evidence taken from the crime scene was tested for DNA. DNA from seminal fluid was found on the back of Walsh's nightgown, the robe tie binding her hands together, and the top sheet covering her. Ultimately, police officers were able to obtain Hopkins's DNA, from a cup he had discarded in the Bridgewater Municipal Building. Hopkins's DNA matched the DNA from the seminal fluid found on Walsh's nightgown, the robe tie binding Walsh's hands and the top sheet covering Walsh.

The Pennsylvania State Police filed a Criminal Information and a Criminal Complaint against Hopkins in January 2012. Hopkins filed an Omnibus Pretrial Motion, which, *inter alia*, sought the suppression of an expert report and testimony by Cyril Wecht, M.D., J.D. ("Dr. Wecht"). The suppression court granted in part and denied in part the Omnibus Pretrial Motion. In particular, the suppression court granted suppression of Dr. Wecht's expert report and testimony. The Commonwealth filed a timely appeal of the suppression court's Order. This Court affirmed in part, and reversed and remanded in part, the Order of the suppression court. In particular, this Court reversed the Order of the suppression court as to the expert report and testimony of Dr. Wecht. ***See Commonwealth v. Hopkins***, 87 A.3d 876 (Pa. Super. 2013) (unpublished memorandum).

- 2 -

Following a jury trial, Hopkins was convicted of third-degree murder. The trial court subsequently sentenced Hopkins to a prison term of eight to sixteen years. Hopkins filed a Post-Sentence Motion, which the trial court denied. Thereafter, Hopkins filed the instant timely appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal.

Hopkins now presents the following claims for our review:

1. Whether the evidence was insufficient as a matter of law when the only evidence linking [Hopkins] to the death of [Walsh] was the presence of his DNA in her apartment, a circumstance that the science of DNA rendered as of no inferential value[,] given the history of their relationship, and where expert testimony was either merely anecdotal or was actually contrary to established science, and where, in any event, it was phrased in probabilistic terms that did not meet the standard of proof beyond a reasonable doubt?

2. Whether the trial court abused its discretion in failing to find that the verdict was against the weight of the evidence when the court misapplied its own standard of review and failed to account for evidence that clearly preponderated against the finding that [Walsh's] death was caused by [Hopkins]?

3. Whether the trial court erred in failing to suppress evidence obtained from an office trash can where [Hopkins] enjoyed an expectation of privacy in his office trash?

Brief for Appellant at 4-5.

Hopkins first claims that the evidence is insufficient to sustain his conviction of third-degree murder. *Id.* at 32. Hopkins relies on the experts' agreement that "the science of DNA *does not* allow anyone to determine the date upon which a DNA sample has been deposited." *Id.* at 34 (emphasis in

original). Further, Hopkins asserts that his DNA could remain on the cloth items, because the washing of a piece of cloth, upon which DNA has been deposited, "not only does not automatically remove the DNA[,] but may readily serve as the vehicle through which it transfers to other items." *Id.*

Hopkins claims that the evidence is insufficient to sustain his guilt where no evidence tied him to the crime in any way; his denials of involvement in Walsh's death were consistent and longstanding; and three unimpeached witnesses supported his alibi for the morning of the murder. *Id.* at 34-35. Further, Hopkins contends, the circumstantial evidence was not of such quantity and quality to support a finding, beyond a reasonable doubt, that his DNA was deposited there on the morning of the murder. *Id.* at 35.

In reviewing a challenge to the sufficiency of the evidence, we evaluate the record "in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Commonwealth v. Bibbs*, 970 A.2d 440, 445 (Pa. Super. 2009) (citation omitted).

> Evidence will be deemed sufficient to support the verdict when it established each element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty, and may sustain its burden by means of wholly circumstantial evidence. Significantly, [we] may not substitute [our] judgment for that of the factfinder; if the record contains support for the convictions they may not be disturbed.

*Id.* (citation and quotation marks omitted). "Any doubt about the defendant's guilt is to be resolved by the factfinder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Scott*, 967 A.2d 995, 998 (Pa. Super. 2009).

In its Opinion, the trial court provided a comprehensive discussion of Hopkins's claim, ultimately concluding that it lacks merit. Trial Court Opinion, 8/26/14, at 2-65 (summarizing the evidence presented at trial), 66-71 (addressing Hopkins's challenge to the sufficiency of the evidence). The trial court's findings are supported in the record, and it legal conclusions are sound. Accordingly, we affirm on the basis of the trial court's Opinion with regard to this claim. *See id.*

Hopkins next claims that the jury's verdict is against the weight of the evidence. Brief for Appellant at 51. Hopkins argues that in denying his Post-Sentence Motion, the trial court failed to apply the proper standard of review. *Id.* at 52. According to Hopkins, the trial court instead applied the standard of review applicable to appellate courts. *Id.* Hopkins contends that in ruling on Hopkins's Motion, "the trial court is not to defer to the jury's discretion[,] but is required to assess the evidence in its own right to determine if a greater weight should have been afforded such compelling testimony." *Id.*

Hopkins further argues that the trial court improperly ignored the alibi evidence presented by his witnesses, and the testimony of his DNA expert. *Id.* As to his DNA expert, Hopkins points to testimony that "no dating of the DNA samples of Hopkins could be accomplished." *Id.* According to Hopkins, the trial court erred when it assumed that "the mere finding of the sample was enough to carry the Commonwealth's burden in this regard." *Id.*

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted). A trial court's discretion in granting or denying a motion for a new trial, based on a challenge to the weight of the evidence, is not unfettered. *Id.*

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is

abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Id.* (citations omitted).

Our review of the record and the trial court's Opinion discloses no abuse of discretion. In assessing the weight of the evidence, the trial court reviewed the evidence supporting each element of the crime of third-degree murder. Trial Court Opinion, 8/26/14, at 67-71. The trial court concluded that the jury's verdict is not against the weight of the evidence, nor is its conscience shocked by the verdict. *Id.* at 70-71; *see also Clay*, 64 A.3d at 1057 n.7 (explaining that the consideration of "whether a verdict shocks the court's conscience is relevant only to a trial court's consideration of a weight of the evidence claim; it is not the standard to be applied by an appellate court on appeal."). Accordingly, we affirm on the basis of the trial court's Opinion with regard to this claim. *See* Trial Court Opinion, 8/26/14, at 66-71.

Hopkins next claims that the suppression court improperly denied suppression of the DNA evidence obtained from Hopkins's discarded drinking cup. Brief for Appellant at 53. Hopkins asserts that by taking his drinking cup from the trash can, the police violated his constitutional rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, and Article 1, Section 8 of the Pennsylvania Constitution. *Id.* at 55.

Hopkins argues that he had an expectation of privacy in trash disposed of in the trash can:

> When trash is placed on the curbside waiting to be picked up in the reasonable course of collection it is considered abandoned property, but when trash is seized before it is taken out and placed at the property boundary in the normal course of trash disposal, the defendant retains a privacy interest in the property and the search and seizure of such trash will be deemed unlawful....

*Id.* at 57.

Hopkins further argues that any abandonment must be complete in order to negate one's reasonable expectation of privacy. *Id.* at 58. Hopkins contends that in this case, his actions did not evidence an intention to completely abandon his expectation of privacy. *Id.* at 59. According to Hopkins,

> [he] took a drink of water in an office where he enjoyed an objectively reasonable expectation of privacy and he deposited his drinking cups in the office waste basket[,] where he no less enjoyed a reasonable expectation of privacy. The police then obtained these cups not at a curbside following the normal course of trash disposal[,] but through the actions of an agent of the police[.] Hopkins[ had an] objective expectation and intention that his drinking cups would be disposed of in the normal course of Bridgewater building waste disposal and not by [Vickie] McDaniels [("McDaniels"), the Borough Secretary,] procuring the garbage....

*Id.* at 61. Thus, Hopkins contends, the warrantless seizure of his cups from the Municipal Building trash was an unreasonable search, and the evidence seized in that search must be suppressed as "fruits of the poisonous tree." *Id.*

Hopkins challenges the ruling of the suppression court.

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.

We may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Gillespie*, 103 A.3d 115, 118 (Pa. Super. 2014)

(quoting *Commonwealth v. Williams*, 941 A.2d 14, 26-27 (Pa. Super.

2008) (*en banc*)).

Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010) (internal citations

and quotation marks omitted).

"Both the Fourth Amendment to the United States Constitution and

Article I, § 8 of the Pennsylvania Constitution protect citizens from

unreasonable searches and seizures." *Gillespie*, 103 A.3d at 118 (citation

omitted). A person challenging a warrantless search or seizure on Fourth

Amendment grounds must demonstrate that (1) he had a subjective

expectation of privacy in the place searched; and (2) his or her subjective

expectation of privacy is one that society is prepared to recognize as reasonable and legitimate. ***Commonwealth v. Perel***, 107 A.3d 185, 188 (Pa. Super. 2014) (quoting ***Katz v. United States***, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

Like the Fourth Amendment, Article 1, Section 8 of the Pennsylvania Constitution has been interpreted as protecting "those zones where one has a reasonable expectation of privacy." ***Commonwealth v. Lawley***, 741 A.2d 205, 209 (Pa. Super. 1999) (citations omitted). In determining what is a reasonable expectation of privacy, all surrounding facts and circumstances must be considered. ***Commonwealth v. Perdue***, 564 A.2d 489, 495 (Pa. Super. 1989) (citations omitted).

"The accessibility of the items to others has been viewed previously by our Court as a critical factor in determining whether a reasonable expectation of privacy in the items exists." ***Lawley***, 741 A.2d at 210. However, the United States Supreme Court has cautioned that

> the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

***Katz***, 389 U.S. at 351 (1967) (internal citations omitted); ***accord Perel***, 107 A.3d at 199.

As this Court has recognized, "a defendant has no standing to contest the search and seizure of items which he has voluntarily abandoned."

*Commonwealth v. Byrd*, 987 A.2d 786, 790 (Pa. Super. 2009). "The determination of whether or not there has been an abandonment of property is an ultimate fact, dependent upon the purported act of abandonment and the manifested intent of the person alleged to have abandoned the property." *Commonwealth v. Sero*, 387 A.2d 63, 69 (Pa. 1978). "The test for abandonment is whether the complaining party could retain a reasonable expectation of privacy in the property allegedly abandoned." *Id*.

> Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered. The issue is not abandonment in the strict property right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.

*Byrd*, 987 A.2d at 791 (emphasis omitted).

This Court previously has held that "placing trash for collection is an act of abandonment which terminates any [F]ourth [A]mendment protection." *Commonwealth v. Minton*, 432 A.2d 212, 217 (Pa. Super. 1981). In *Minton*, police removed a large plastic trash bag sitting at the curb side directly in front of the defendant's residence, after which they discovered marijuana in the bag. *Id.* at 216. In ascertaining the defendant's privacy interest in the bag, this Court stated the following:

> Perhaps the defendant did in fact believe that the incriminating evidence of his crime so disposed of would go undetected. If defendant did, we view it only as additional bad judgment on his part. In the real world to so view the status of one's discarded

> trash is totally unrealistic, unreasonable, and in complete disregard of the mechanics of its disposal. In our view the placing of trash in the garbage cans at the time and place for anticipated collection by public employees for hauling to a public dump signifies abandonment. Defendant may have decided to assume the risk, calculating no one would think to search in his garbage can, or he may have been careless, but whatever his reason he evidenced an intent in a convenient but risky way to permanently disassociate himself from the incriminating contents.

*Id.* at 217 (citation omitted).

Similarly, in **Perdue**, the pastor of a church had been removed by the church trustees, and informed that his living accommodations would soon be terminated. **Perdue**, 564 A.2d at 478. The pastor was permitted to remain until October 20, 1986. **Id.** Prior to that date, the church was severely vandalized. **Id.** at 477-78. A police investigator came to the church premises and recovered evidence, implicating the pastor in the vandalism, from a garbage bag located in a can under the parsonage porch. **Id.** Evidence was also discovered and retrieved from inside the parsonage during a warrantless search, including items contained within a filing cabinet. **Id.** at 478-79. The trial court refused to suppress this evidence. **Id.** at 479. On appeal, this Court upheld the trial court's decision not to suppress the evidence:

> Instantly, the record indicates that the parsonage is connected with the church by a covered walkway. Being next to a church, the public has easy access to the parsonage and the surrounding area. In addition we note that, in many instances, a parsonage is not used exclusively as a dwelling, but for other purposes, including meeting and counseling members of the church. As a result, the parsonage and its surroundings are subject to public

access. Thus, like the garbage left for collection in ***Minton*** …, the garbage in the instant case was subject to public inspection. Consequently, no objectively reasonable expectation of privacy existed….

***Id.*** at 482. Thus, the Court emphasized the public's access to the items in determining whether there existed a reasonable expectation of privacy. ***Id.***

Here, after eating candy from McDaniels's desk, Hopkins took a plastic cup from a receptacle next to the office water cooler. N.T., 9/16/12, at 54-55. Using that cup, Hopkins drank water from the water cooler. ***Id.*** at 54. Hopkins then threw the cup into the trash can located next to the water cooler. 54, 55-56. Immediately thereafter, Hopkins exited the Municipal Building. ***Id.*** at 54. McDaniels testified that she emptied the trash can daily. ***Id.*** at 56. The trash can, used by Hopkins, is located in a public building, in an area open to and accessible by the public from 8:00 a.m. to 4:30 p.m. ***Id.*** at 50. The water cooler and trash can are located four feet from the entrance to the building. ***Id.*** McDaniels specifically testified that the water cooler and trash can are available to and accessible by the public. ***Id.*** at 56.

The evidence, viewed in a light most favorable to the Commonwealth, reflects that Hopkins abandoned any reasonable expectation of privacy in his cup, and the DNA on that cup, when he discarded it in a trash can, which was available to and accessible by the public, and which was emptied daily. Further, the evidence reflects that Hopkins's abandonment was completed after discarding the cup in a location open to public inspection, then exiting

the building. Regardless of whether McDaniels had acted as an agent of the Commonwealth, Hopkins retained no reasonable expectation of privacy in the discarded cup, or any evidence collected from that cup. Discerning no error or abuse of discretion, we cannot grant Hopkins relief on his claim. Accordingly, we affirm Hopkins's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/31/2015



# IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY PENNSYLVANIA

## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      :

                                                   :

             vs.                           :        No. 580 of 2012

                                                   :

GREGORY SCOTT HOPKINS        :

## OPINION AND ORDER

**H. KNAFELC, J.**                                       **August 26, 2014**

Before the Court is the Statement of Errors Complained of on Appeal, wherein the Defendant, Gregory Scott Hopkins, sets forth several allegations of error. Trial in this matter concluded on November 22, 2013, after the jury rendered a verdict of guilty as to the count of Third Degree Murder regarding Catherine Janet Walsh on September 1, 1979.[1] On February 26, 2014, this Court sentenced the Defendant to pay a fine of $10,000.00 and undergo imprisonment in the State Penal or Correctional Institution or Facility for not less than eight (8) years not more than sixteen (16) years. He received credit for his incarceration from January 29, 2012 until December 4, 2012, and from November 22, 2013 until the date of sentence. The trial court denied the Defendant's post – trial motions on May 28, 2014.

---

[1] A Criminal Complaint was filed by the Pennsylvania State Police in this matter on January 29, 2012. A Criminal Information was filed on June 18, 2012. The Defendant filed an Omnibus Pre – Trial Motion on July 6, 2012. This Court granted that motion in part on November 5, 2012, when the Court granted the Defendant's Motion to Preclude Expert Report and Testimony. The Superior Court reversed this Court's decision on October 4, 2013. This Court disposed of the remainder of the Pre – Trial issues in its Opinion and Order dated November 4, 2013, wherein the Court denied the Motion to Suppress DNA evidence and the evidence seized from the Defendant's place of employment, denied the Defendant's Application to Dismiss due to Pre – Arrest Delay, and denied the Defendant's Motion for Change of Venue. Trial in this matter commenced on November 7, 2013.

The Defendant's Statement of Errors Complained of on Appeal sets forth the following: 1) insufficiency of the evidence to sustain a conviction of Third Degree Murder: 2) that the verdict was against the weight of the evidence: 3) that the evidence seized from the Defendant's place of employment should have been suppressed in accordance with the Fourth and Fourteenth Amendments to the United States Constitution and Article 1 Section 8 of the Pennsylvania Constitution: 4) that the Criminal Information should have been dismissed as a result of pre – arrest delay in violation of the Defendant's due process rights: 5) that the trial court erred in admitting the trial testimony of Detective Andy Gall when he allegedly vouched for the credibility of the victim's husband, Scott Walsh, in asserting that Mr. Walsh's statements were consistent: 6) that the trial court erred in allegedly eliciting the testimony of Detective Andy Gall in a manner that allegedly rehabilitated him with respect to taking certain statements: 7) that the trial court erred in excluding the testimony of Officer Patrick Young regarding the statements of Leo Bianco proffered by the Defendant regarding how many times the sheet had been removed from the victim as being hearsay: 8) that the trial court erred in sustaining the Commonwealth's objection to the redirect testimony of Dr. Mark Perlin regarding certain charts he had made: 9) that the trial court erred in overruling the Defendant's objection to the cross examination of the Defendant's character witness, Richard Neff: 10) that the trial court erred in overruling the Defendant's objection to the cross examination of Richard Neff regarding whether he was aware of the fact that Hopkins had hidden assets during bankruptcy: 11) that the trial court injected itself into the questioning of Detective Andy Gall in a way that improperly bolstered his credibility regarding the quality of tape recordings and their transcription: and 12) that the trial court erred when it provided the jury with written instructions on the elements of the offense over the Defendant's objection that other parts of the charge should be sent out to the jury.

The crux of the issue in this case dealt with the identity of the perpetrator. As such, the expert testimony in this matter was critical to determining that issue. We have summarized the salient and pertinent testimony presented at trial as follows:

Elaine DeLuco testified first on behalf of the Commonwealth. She testified that she grew up in Monaca, and stated that she knew the victim, Janet Walsh, because of the fact that

2

the victim's grandmother lived across the street from her while she was growing up. (N.T. 11/12/13 at 49). She stated that she also knew the victim from school, and further noted that Margie Farinacci is her ex sister – in – law; they were married to bothers. (N.T. 11/12/13 at 49). She testified that on August 31, 1979, she had met her sisters – in – laws, Margie Farinacci and Georgina Beightley, and Janet Walsh at the nightclub at the Gee Bee Plaza. (N.T. 11/12/13 at 50). She explained that they met at the Getaway at almost 11:00 p.m. (N.T. 11/12/13 at 51). She noted that she drove her sister – in – law Georgie there. (N.T. 11/12/13 at 51). She noted that Scott Walsh, Janet's husband, lived across the street from her in – laws. (N.T. 11/12/13 at 52). She relayed that when she arrived, Margie Farinacci and Janet Walsh were already there. (N.T. 11/12/13 at 52). She noted that they were sitting at a table having a drink while talking and laughing. (N.T. 11/12/13 at 53). She further noted that she believed the Janet Walsh danced with someone that evening. (N.T. 11/12/13 at 54). She explained that they stayed until 2:00 or 2:30 a.m., when the bar closed. (N.T. 11/12/13 at 54). She stated that she and Georgie went home, and Janet Walsh and Margie Farinacci went to Perkins. (N.T. 11/12/13 at 55). She asserted that Margie Farinacci called her the next day and stated that she had received a call from Janet's parents, who were concerned that Janet had not shown up for work; DeLuco noted that she then went around the corner to where Janet Walsh had lived and observed that the police were there. (N.T. 11/12/13 at 55).

On cross, DeLuco set forth that she had heard of the Defendant because she was aware of the fact that he had built her sister – in – law's home. (N.T. 11/12/13 at 56). She asserted Bob McGrail was the individual the victim danced with that night. (N.T. 11/12/13 at 57). She further agreed that McGrail left the Getaway with Margie Farinacci and the victim, and they intended to go to Perkins. (N.T. 11/12/13 at 58 - 59). She noted that McGrail was with an individual named Al when she first met him, and also someone named Sam Johns, who was a Center Township police officer. (N.T. 11/12/13 at 61). She observed that Sam and Al left, but McGrail had stayed. (N.T. 11/12/13 at 62). She asserted that she saw Janet Walsh, Margie Farinacci and McGrail walk towards Perkins. (N.T. 11/12/13 at 63). She noted that she went to the police station on September 1, 1979 in the afternoon, when she gave a written statement. (N.T. 11/12/13 at 63).

3

Georgina Wilson testified next on behalf of the Commonwealth. She noted that back on August 31, 1979, her last name used to be Beightley. (N.T. 11/12/13 at 65). She stated that her sister – in – law, Margie Farinacci, was friends with Janet Walsh. (N.T. 11/12/13 at 66). She explained that she went out the evening of August 31, 1979 with her sister – in – law, Elaine, at around 10:00 or 10:30 to the Getaway in Gee Bee Plaza in Center Township. (N.T. 11/12/13 at 66 – 67). She noted that at that time she resided at Washington Avenue, Monaca. (N.T. 11/12/13 at 67). She explained that when she arrived there with Elaine, they met up with Margie Farinacci and Janet Walsh. (N.T. 11/12/13 at 68). She stated that the four of them sat at a table. (N.T. 11/121/3 at 68). She recalled that Marie Farinacci and Janet Walsh may have danced. (N.T. 11/12/13 at 69). She further testified that she left with her sister – in – law Elaine at around 2:00 a.m., and noted that Margie and Janet had told them that they were going to Perkins to get something to eat. (N.T. 11/12/13 at 70). On cross, she noted that Janet Walsh drank that evening, but she was not aware of how many drinks Janet Walsh had consumed. (N.T. 11/12/13 at 73).

Margie Farinacci testified next on behalf of the Commonwealth. She noted that she resides in Monaca on Ella Street. (N.T. 11/12/13 at 78). She asserted that she is an administrator at a doctor's office. (N.T. 11/12/13 at 78). She testified that Colony Square Builders built her home, and Scott Hopkins, the Defendant, was the owner. (N.T. 11/12/13 at 79). She advised that Colony Square built the last four homes on Ella Street, including her neighbor's home. (N.T. 11/12/13 at 79 - 80). She noted that she did construction cleaning for Colony Square Builders for about a year. (N.T. 11/12/13 at 81 - 82). She further explained that Larry Musgrave worked for Colony Square Builders, and had worked with her and her husband to pick out carpeting and appliances, etc. (N.T. 11/12/13 at 82 - 83). She explained that Janet and Scott Walsh lived next door to her. (N.T. 11/12/13 at 83). She further noted that she had grown up across the street from Scott Walsh. (N.T. 11/12/13 at 84). She noted that she and her husband went out with Janet and Scott Walsh on several occasions. (N.T. 11/12/13 at 85 – 86). She further testified that sometimes while she was doing a heavy construction cleaning, Janet Walsh would bring lunch to her. (N.T. 11/12/13 at 86 – 87).

4

Farinacci testified that on August 31, 1979, Janet and Scott Walsh were having problems and were either separated or divorced. (N.T. 11/12/13 at 88). She noted that on that date, she and Janet Walsh, along with her sisters – in law, Georgie and Elaine, went out for the evening. (N.T. 11/12/13 at 88, 90). She further remembered that at that time Janet Walsh was living on Indiana Avenue and Scott Walsh was still residing in the house next to her. (N.T. 11/12/13 at 89). She explained that Janet Walsh was very clean and always cleaned her apartment. (N.T. 11/12/13 at 89). She asserted that the four women went to the Getaway that evening. (N.T. 11/12/13 at 90). She noted that first, she and Janet had stopped at the Top of the Mall at the Beaver Valley Mall. (N.T. 11/12/13 at 92). After that, they went to the Getaway at the Gee Bee Plaza and met Elaine and Georgie there. (N.T. 11/12/13 at 94). She testified that she and Janet both drove that night. (N.T. 11/12/13 at 94). She agreed that they all had a few drinks. (N.T. 11/12/13 at 95). She stated that she remembered that there had been dancing, but could not remember any of the specifics. (N.T. 11/12/13 at 96). She noted that they stayed until the bar closed at around 2:30 a.m. (N.T. 11/12/13 at 97). She testified that at that point, she and Janet walked to Perkins, and her sisters – in – law went home. (N.T. 11/12/13 at 97). She testified that the report she reviewed noted that a guy named McGrail went to Perkins with them and sat down with them at the booth; he was attempting to get a ride home, but Janet told him to move to another table. (N.T. 11/12/13 at 98). She further noted that the report set forth that he then sat with people with whom he worked. (N.T. 11/12/13 at 98). She further relayed that she believed that they left Perkins at around 4:00 a.m. (N.T. 11/12/13 at 99). She stated that she then got into her car and went home. (N.T. 11/12/13 at 99).

Farinacci testified that the next day there was a Labor Day picnic for Colony Square Builders' employees at the model home. (N.T. 11/12/13 at 100 – 01). She stated that Scott Hopkins was running Colony Square Builders. (N.T. 11/12/13 at 101). She noted that she and her husband had planned to attend the picnic and she was supposed to bring lasagna there. (N.T. 11/12/13 at 102). Farinacci then asserted that they did not attend the picnic because one of Janet's parents had called her, and then her sister – in – law Elaine had come up to her house and was wondering why there were police cars at Janet's home. (N.T. 11/12/13 at 103). She noted that she and Elaine then drove down to Janet's apartment. (N.T. 11/12/13 at 104). At

5

that point, she spoke with Janet's brother and was informed that Janet was deceased, and the Coroner and police were there. (N.T. 11/12/13 at 105). She asserted that at one point that day, she walked through the apartment, and observed that the victim's ironing board was up along with the dress she had worn the night before lying over the ironing board. (N.T. 11/12/13 at 106 - 07). Further, she observed that Janet's shoes were on the floor in a normal position and her jewelry was laid out on the dresser. (N.T. 11/12/13 at 107). She stated that at some point that day, she was with Detective Gall and the Chief at the police station. (N.T. 11/12/13 at 108). She further noted that it was her understanding that her husband had called Scott Hopkins to let him know they would not be attending the picnic. (N.T. 11/12/13 at 109).

On cross, Farinacci asserted that after Janet and Scott Walsh separated, Janet moved to downtown Monaca, which was a mile or two from Farinacci's home. (N.T. 11/12/13 at 112). Farinacci was shown a police report dated September 10, 1979, and agreed that in accordance with what she had told Detective Gall then, Scott Walsh had been following Janet and had continuously asked Farinacci about Janet. (N.T. 11/12/13 at 113 - 14). She noted that the report indicates that there were some occasions where she, Janet Walsh and Scott Hopkins were together, and she was the one who had introduced Scott Hopkins to Janet. (N.T. 11/12/13 at 115). She agreed that on August 31, 1979, Janet Walsh had picked her and her son up and took them to Wendy's restaurant; they then returned to Farinacci's house. (N.T. 11/12/13 at 115). She further agreed that at around 9:45 p.m., Farinacci went to Janet Walsh's apartment on Indiana Avenue; the two of them each took separate cars and went to the Top of the Mall. (N.T. 11/12/13 at 116 - 17). She noted that they each had a drink there and then left and drove to the Getaway in Gee Bee Plaza, where they met up with Elaine Farinacci and Georgina Beightley. (N.T. 11/12/13 at 117). She agreed that they were drinking while at the Getaway. (N.T. 11/12/13 at 118). She further agreed that according to Detective Gall's October 4, 1979 report, the victim had four to five Southern Comfort Manhattans and had danced with Robert McGrail. (N.T. 11/12/13 at 118). She reiterated that at around 2:30, Georgina and Elaine went home. (NT. 11/12/13 at 119 - 20). She further agreed that she, Janet Walsh and McGrail went to Perkins together, and at one point, Janet Walsh asked McGrail to leave the table, stating that her husband gets upset when he sees her with other men. (N.T.

6

11/12/13 at 120 - 21). She also noted that she had left Perkins at around 4:00 a.m.; she does not recall seeing Janet Walsh get into her car and drive away, and further did not recall seeing McGrail leave. (N.T. 11/12/13 at 124). On re-direct, Farinacci denied having any contact with Scott Walsh when she got home. (N.T. 11/12/13 at 132 – 33).

Next, Francesco Caltieri testified on behalf of the Commonwealth. He stated that he was Janet Walsh's brother. (N.T. 11/12/13 at 134). He testified that in late August, early September of 1979, Janet Walsh was residing at 935 Indiana Avenue and owned a lime green Monte Carlo. (N.T. 11/12/13 at 135). He asserted that his father, Pete Caltury, passed away on June 28, 2013. (N.T. 11/12/13 at 137). Francesco Caltieri then read into evidence a transcript from a prior proceeding in which Pete Caltury had previously testified. (N.T. 11/12/13 at 137 – 38).

Peter Caltury testified that his daughter, Janet Walsh, had lived in an apartment at 935 Indiana Avenue in the bottom half of the building; the apartment had three doors. (N.T. 11/12/13 at 139 – 40). He noted that the front, back and side doors all had locks, and he stated that he would typically visit her by entering though the front door. (N.T. 11/12/13 at 140). He asserted that she usually had the doors locked. (N.T. 11/12/13 at 140 – 41). He indicated that he visited her two or three days a week. (N.T. 11/12/13 at 141). He testified that around the time of her death, his daughter had asked him to change the locks, but he had never gotten around to doing it. (N.T. 11/12/13 at 141). He relayed that she typically kept her residence clean and neat, and she was up to date on her laundry. (N.T. 11./12/13 at 142).

Pete Caltury asserted that on September 1, 1979, at around 10:00 or 10:30 a.m., Ron Ciccozzi, his daughter's boss, had called him and reported that Janet had not shown up for work. (N.T. 11/12/13 at 143). He stated that they tried to call her but got no answer, so they drove to her house; they got in through the back door with a key. (N.T. 11/12/13 at 143 - 44). He noted that the back door opened into the kitchen. (N.T. 11/12/13 at 144). He indicated that his wife, Mary Jane, was with him at the time. (N.T. 11/12/13 at 144). He stated that he then went into his daughter's bedroom, and saw her face down on the bed; he pulled the bed sheet away and saw that her hands were tied behind her back with a cord. (N.T. 11/12/13 at 145 – 46). He then testified that he couldn't get a pulse from her wrist, so he called the police. (N.T.

7

11/12/13 at 146). He then chased his wife out of the room. (N.T. 11/12/13 at 147). He asserted that he did not touch any of the evidence or move the body; he also did not move the sheet again. (N.T, 11/12/13 at 147). He then stated that five minutes later, Officer Andy Gall arrived; he let him in through the front door. (N.T. 11/12/13 at 148). He further asserted that he unlocked the front door to let the officer in, and also noted that his mother owned the residence at 935 Indiana Avenue. (N.T. 11/12/13 at 148). On cross, Pete Caltury stated that he first entered the residence through the back door, he did not notice anything unusual or disturbed in the kitchen, the hallway leading to the bedroom, or the bedroom. (N.T. 11/12/13 at 149 - 50). He indicated that there was nothing about the bedroom that indicated a struggle. (N.T. 11/121/3 at 151).

Detective Andrew Gall was the lead investigator in this matter and testified as follows during trial: Detective Gall stated that he is currently the Assistant Chief of Detectives for the Beaver County District Attorney's office, and has been so employed since 1988. (N.T. 11/12/13 at 161). He noted that he started working as a police officer for the Borough of Monaca in 1975; he also worked part-time in Chippewa and as a patrolman in Baden. (N.T. 11/12/13 at 161). He further relayed that he was one of the investigating officers in this matter. (N.T. 11/12/13 at 162).

Detective Gall testified that he became involved with the case at hand when he received a call form Jim Kovac of the Monaca Police Department, who informed him that a man at 935 Indiana Avenue had called because he had found his daughter dead. (N.T. 11/12/13 at 163). Detective Gall asserted that he went to the house immediately, knocked on the door, and was let in by Mr. Caltury, who unlocked the chain lock to let him in. (N.T. 11/12/13 at 164 – 65). At that point, Detective Gall observed that Mary Jane Caltury, Mr. Caltury's wife, was in the first part of the room, which was a sun porch. (N.T. 11/12/13 at 169). He testified that he then went back to bedroom and viewed the body of the victim. (N.T. 11/12/13 at 169). He stated that the bed sheet was up near her neck, and he could tell by the appearance of her fact that she was deceased. (N.T. 11/12/13 at 170). Detective Gall testified that he shut down the scene, and then called Chief Conti, the Pennsylvania State Police, the Coroner's office, a photographer, and the Beaver County Detectives. (N.T. 11/12/13 at 170). He further explained

8

that there was a rear door to the residence from which the Calturys had entered into the home, and also noted that there was an alley located behind the home running parallel between Atlantic Avenue and Indiana Avenue. (N.T. 11/12/13 at 172). He also pointed out that the victim resided in the bottom apartment of the home, and noted that the steps up to the back door led up to the victim's bedroom. (N.T. 11/12/13 at 173 - 74). Detective Gall relayed that when he walked into the residence, he noticed a key with a "Reliable Refrigeration" key chain with a support check from Scott Walsh rolled up into it, which he placed on a stool to get it out of the way. (N.T. 11/12/13 at 175 – 76, 181-82). He further asserted that Gwen Sloan was the photographer who took pictures of the crime scene. (N.T. 11/12/13 at 176). He noted that the pictures placed into evidence depicted that the victim's furniture was sparse, but was well – kept and very neat. (N.T. 11/12/13 at 179). In explaining a sketch of the victim's bedroom as it was on September 1, 1979, he noted that her bedroom contained a bed, an end table with a phone, lamp, and an alarm clock on it, a pillow from the bed that was on the floor, a clothes basket containing towels, panties and pantyhose, another clothes basket, an exercise bicycle, a pillow on the bed, a bathrobe lying at the bottom of the bed, a small stand in the corner of the room, and an ironing board with shoes under it. (N.T. 11/12/13 at 183). The Commonwealth then displayed a picture of the victim as she was found, and it depicted that the victim was wearing a light blue handkerchief around her neck and a nightgown. (N.T. 11/12/13 at 184 – 85). Detective Gall noted that the handkerchief was tied tightly around her neck, and was knotted around her hair. (N.T. 11/12/13 at 185).

Detective Gall relayed that Chief Rocky Conti, the Monaca Police Chief, arrived, and two Center officers arrived and went to the front of the house. (N.T. 11/12/13 at 185 – 86). After that, Deputy Coroner Harper Simpson, Detectives Bernie Cashdollar and Royal Hart from the Beaver County District Attorneys' office, and Pennsylvania State Trooper Rich Matas arrived. (N.T. 11/12/13 at 185 – 86). Prior to the detectives, the State Trooper and the Coroner arriving, Detective Gall took the Calturys to their car and then to the police station for a statement. (N.T. 11/12/13 at 188). At that point, he learned that the victim had been out with three ladies the evening before. (N.T. 11/12/13 at 188). Elaine Farinucci (now Elaine DeLuco) and Margie

9

Farinacci both gave statements. (N.T. 11/12/13 at 188 – 89). The victim's body was removed by ambulance and was taken to the Rochester Hospital. (N.T. 11/12/13 at 190).

On cross, Detective Gall noted that when Mr. Caltury had called the police from the phone next to the bed, he also called Leo Bianco, his brother – in – law, along with Mr. Caltury's two sons. (N.T. 11/12/13 at 191). He agreed that Mr. Caltury had pulled the sheet down to look at the body, but he stated that he couldn't remember if Leo Bianco had pulled the sheet down. (N.T. 11/12/13 at 192). He further noted that when he got to the front door, it was unlatched by Mr. Caltury for the first time that day. (N.T. 11/12/13 at 192). He agreed that he saw no signs of forcible entry. (N.T. 11/12/13 at 193). He further noted that when he arrived at the home, Janet Walsh's car was parked in front. (N.T. 11/12/13 at 193). He agreed that he checked the body and secured the scene. (N.T. 11/12/13 at 194).

Detective Gall further asserted that he found a support check from Scott Walsh and a Dale Carnegie mail-out wrapped in a Reliable Refrigeration keychain on the floor when he went in through the front door. (N.T. 11/12/13 at 195 – 96). He noted that based upon his investigation, Janet's husband had found the keychain in the yard of the house where the victim and Walsh had lived together. (N.T. 11/12/13 at 196). He noted that the Pennsylvania State Police became the primary investigating agency for the entire case. (N.T. 11/12/13 at 200).

Harper Simpson testified next for the Commonwealth. He stated that he is retired from the Allegheny County Department of Health and the Florida Department of Health. (N.T. 11/12/13 at 202). He noted that he served as the Deputy Coroner for Beaver County from 1973 until 1983. (N.T. 11/12/13 at 202). He asserted that he was called to the scene on Indiana Avenue by the Monaca police in order to determine the cause and manner of death. (N.T. 11/12/13 at 203 – 04). He noted that he had reported on the Vital Information form that the victim had been getting a divorce, but it was not yet finalized. (N.T. 11/12/13 at 207). Also, his report set forth that the time of death was estimated to be around 5:00 a.m.; he noted that he received that information from the pathologist. (N.T. 11/12/13 at 207). He explained that the time and date listed of September 1, 1979 at 1:05 p.m. was the time he had the whole view of the death scene. (N.T. 11/12/13 at 207). He further testified that the manner of death was

10

strangulation. (N.T. 11/12/13 at 208). He also noted that when he entered the bedroom at 935 Indiana Avenue, nothing appeared to be disturbed and everything appeared to be in order. (N.T. 11/12/13 at 210). On cross, Mr. Simpson again reiterated that the Coroner's report indication that the estimated time of death was approximately 5:00 a.m. was based upon Dr. Gary Marcus' findings regarding the contents of her stomach as determined from the autopsy. (N.T. 11/12/13 at 216).

Next, Dr. Gary Marcus M.D. testified on behalf of the Commonwealth. He testified that he is a pathologist, and noted that in 1979, he was employed as a pathologist in Beaver County. (N.T. 11/12/13 at 222). He agreed that Commonwealth's Exhibit No. 26 was his autopsy report prepared on September 1, 1979. (N.T. 11/12/13 at 222 – 23). He agreed that the victim's nightshirt was on her body at the time of the autopsy, and was turned over to the police. (N.T. 11/12/13 at 223). He denied that alternative light source testing was available back in 1979. (N.T. 11/12/13 at 223). He noted that there were ligature marks on the victim's neck and wrists. (N.T. 11/12/13 at 224). Moreover, he stated that he saw no signs of struggle. (N.T. 11/12/13 at 226). He asserted that the cause of death was asphyxia, secondary to strangulation. (N.T. 11/12/13 at 228). He asserted that he believed her time of death was sometime between 5:00 a.m. and 7:00 a.m. based upon the gastric contents. (N.T. 11/12/13 at 228). On cross, Dr. Marcus asserted that he took swabs from the victim's mouth and vagina. (N.T. 11/112/13 at 235). On re-direct, Dr. Marcus noted that the time of death could have been earlier, depending upon when the victim ate last. (N.T. 11/12/13 at 236). On re-cross, he affirmed that he found no evidence of rape. (N.T. 11/12/13 at 239).

Dr. James Smith testified next on behalf of the Commonwealth. He testified that he is an M.D. and a forensic pathologist who has been involved in forensic pathology for twenty - five (25) to thirty (30) years. (N.T. 11/13/13 at 6). He asserted that in 1989, he was asked to review an autopsy report from Dr. Marcus regarding this case. (N.T. 11/13/13 at 7). He stated that he agreed with Dr. Marcus' conclusions. (N.T. 11/13/13 at 8). He described the evidence of the victim choking due to the handkerchief around her neck. (N.T. 11/13/13 at 12-13). Further, he noted that the Commonwealth's Exhibit 27 displayed the handkerchief around the victim's neck and the cord from the bathrobe tying her hands behind her back. (N.T. 11/13/13 at 13). He

11

asserted that the evidence indicated that the rope was tied on her hands prior to her death because of the degree of cyanosis. (N.T. 11/13/13 at 13-14).

Trooper Richard Matas testified next on behalf of the Commonwealth. He asserted that he was a Trooper for the Pennsylvania State Police for twenty – five (25) years, and worked in the Criminal Investigation unit. (N.T. 11/13/13 at 21 - 22). He recalled being called to the scene of this crime in 1979 after receiving a call from Detective Andy Gall of the Monaca Police Department regarding the situation at 935 Indiana Avenue. (N.T. 11/13/13 at 23 - 24). When he arrived at the scene, Harper Simpson and other police officers from Monaca were there. (N.T. 11/13/13 at 24). He asserted that he and Patrolman Gall went into the residence and then into the bedroom where the victim was located. (N.T. 11/13/13 at 25). Trooper Matas noted that he observed that the apartment was very clean and orderly. (N.T. 11/13/13 at 25). Further, he noted that the apartment was a first floor apartment, and there didn't appear to be any forced entry into the residence. (N.T. 11/13/13 at 25). He explained that the victim was on her bed with her face down, had a blue workman's handkerchief tied around her neck, and her hands were tied behind her back (N.T. 11/13/13 at 25 - 26). He asserted that the victim was partially covered by the bed sheet when he first observed her, and further noted that he removed the part of sheet and observed the victim. (N.T. 11/13/13 at 26). He explained that the police tried to maintain the continuity of the scene from its initial discovery up until the collection of the evidence. (N.T. 11/13/13 at 27). He further noted that Gwen Sloan, the local photographer, took photographs of the crime scene before the evidence was collected. (N.T. 11/13/13 at 27). He noted that the photographer was directed by himself or Trooper Fred Rea, who was the records and information officer, in photographing the crime scene. (11/13/13 at 28). After the pictures were taken and Trooper Rea arrived at the scene, certain items were processed and dusted for fingerprints. (N.T. 11/13/13 at 30). He noted that after that, the evidence was collected from the victim's person. (N.T. 11/13/13 at 30). He further noted that Trooper Rea submitted a reported indicating that the latent prints that were lifted matched the victim, with the exception of some latent prints from the passenger side window of her vehicle which were not identified. (N.T. 11/13/13 at 31). Regarding the collection of evidence, he explained that the handkerchief that was tied around her neck was cut from her neck while

12

leaving the knot in place, placed in a State Police evidence envelope, and labeled. (N.T. at 11/13/13 at 31). He further noted that the rope would have been cut, not left in place, and secured in a State Police evidence envelope. (N.T. 11/13/13 at 31 - 32). Upon reviewing Commonwealth's Exhibit 18, a photograph of the victim, Trooper Matas identified the photo as depicting the victim in the position in which he observed her initially. (N.T. 11/13/13 at 33). He further asserted that he took the sheet off of the victim. (N.T. 11/13/13 at 34). He further pointed out that the handkerchief ligature was sufficiently tight to cause indentations in the victim's throat. (N.T. 11/13/13 at 36). He further noted that he cut off the ropes from around her hands using an instrument, and noted that the ropes were tied tight enough to prevent the victim from escaping the tie. (N.T. 11/13/13 at 37). He stated that the victim had reddening around her wrists resulting from the tight binding of the cord. (N.T. 11/13/13 at 38). He further identified the articles of clothing on the ironing board in the bedroom as the clothes she had been wearing when she was out for the evening. (N.T. 11/13/13 at 39). He insisted that nothing was out of place and nothing appeared to be ransacked. (N.T. 11/13/13 at 40).

Trooper Matas further noted that he went to the Rochester Hospital after the autopsy had been performed to collect the nightshirt top that had been covering the victim from the waist up. (N.T. 11/13/13 at 42). He noted that he placed the nightshirt in the evidence bag and labeled it at 6:30 on September 1, 1979. (N.T. 11/11/13 at 44 - 45). He further identified the handkerchief and the rope which bound the victim's hands, which he collected on September 1, 1979. (N.T. 11/13/13 at 46 - 48). He further identified the blue terrycloth robe that he retrieved when he picked it up from the lower portion of the bed at the base of the victim's feet, to the right of her body. (N.T. 11/13/13 at 49). Also, he identified the fitted sheet, top sheet, and pillow cases he removed from the victim's bed. (N.T. 11/13/13 at 50 – 52). Further, he noted that he observed what appeared to be a large urine stain in the center of the sheet. (N.T. 11/13/13 at 52-53). Moreover, he asserted that he didn't detect any foreign matter on the nightgown. (N.T. 11/13/13 at 53). Also, he displayed for the jury the set of keys with a yellow tag setting forth "Reliable Refrigeration," a piece of mail, and a check from Scott Walsh in the amount of $75.00 made out to Catherine Walsh dated September 1, 1979. (N.T.

13

11/13/13 at 55 – 56). He agreed that the evidence he collected was sent to the State Police Crime Lab, and he received a report back from them. (N.T. 11/13/13 at 56 – 57).

On cross, Trooper Matas reiterated that when he arrived at the scene, he observed that the body was partially covered. (N.T. 11/13/13 at 59). He again noted that the bathrobe found at the foot of the bed was missing the cord, so he made the assumption that the cord that had been tied around the victim's hands could have come from that bathrobe. (N.T. 11/13/13 at 63). He again agreed that he had arrived at the scene that day at 1:05 p.m., and was briefed by Chief Conti and Patrolman Gall of the Monaca Police Department. (N.T. 11/13/13 at 67). He further agreed that he had removed the sheet from the body. (N.T. 11/13/13 at 68). He also agreed that he saw no signs of forced entry, and the front door had a chain and key lock on it. (N.T. 11/13/13 at 68). He also agreed that the side door could only be locked from the inside, and the back door had a hex lock on it, which would cause it to lock when it was pulled shut. (N.T. 11/13/13 at 69 - 70). He noted that the assailant would have to have left through either the back or side door. (N.T. 11/13/13 at 69). He further explained that Trooper Fred Rea lifted fingerprints from a glass in the kitchen and from the passenger side window of the vehicle; the fingerprints from the kitchen glass matched the victim and the fingerprints from the vehicle were not matched to anyone. (N.T. at 11/13/13 at 70 – 72). He further agreed that the victim's vehicle was parked out in front of the home. (N.T. 11/13/13 at 74 – 75). He also asserted that he was not able to uncover anything to suggest the Defendant was with the victim at the Getaway Lounge or the Top of the Mall. (N.T. 11/13/13 at 75).

Again, Trooper Matas explained that he did not observe any staining on the nightgown top when he observed it on the victim. (N.T. 11/13/13 at 76). Further, he noted that he also did not observe any liquid or markings on the robe tie. (N.T. 11/13/13 at 78). He denied noticing any substance on the handkerchief. (N.T. 11/13/13 at 82). He further testified that he observed a small amount of blood coming from the victim's mouth. (N.T. 11/13/13 at 85). Further, he stated that he collected the two bed sheets and put them in the same bag. (N.T. 11/13/13 at 86). He agreed that he took the packaged evidence from the scene back to the Pennsylvania State Police Barracks in Chippewa Township, and turned the items over to the receiving officer, who would have secured them in the evidence room. (N.T. 11/13/13 at 88).

14

Later, the items were transported to the Greensburg Crime Lab in the containers in which they had been packaged. (N.T. 11/13/13 at 89). He explained that after the laboratory had completed its analysis, the State Police received a report back from the laboratory. (N.T. 11/13/13 at 94). He identified Exhibit F as the lab report that he would have received back from Ralph Plankenhorn, Criminologist with the Pennsylvania State Police, with regard to the items that were taken from the scene plus the rape kit, and noted that the items listed were the items he submitted. (N. T. 11/13/13 at 97). He agreed that regarding the nightgown top, the finding he received from the report dated September 21, 1979 set forth that it did not have any observable trace evidence. (N.T. 11/13/13 at 100).

On re-direct, Trooper Matas noted that regarding the Reliable Refrigeration keys that were found that had been placed through the mail slot by Scott Walsh, the keys had been found by Scott Walsh between his house and Margie Farinacci's house. (N.T. 11/13/13 at 103). He explained that the keys did not work at the victim's residence, and further pointed out that Margie Farinacci also worked at Reliable Refrigeration. (N.T. 11/13/13 at 103). He further agreed that based upon the investigation, the victim was killed in her bed. (N.T. 11/13/13 at 103). He further noted that "DNA was not even remotely thought of in 1979." (N.T. 11/13/13 at 104). He also agreed that in accordance with Plankenhorn's report, the hair found in the handkerchief was the victim's hair. (N.T. 11/13/13 at 105). Further, the victim's blood type matched the blood found on the pillowcase. (N.T. 11/13/13 at 106). He reiterated that the fingerprints on the glasses lifted by Trooper Rea matched the victim's, and the fingerprints lifted from the passenger side window did not match the victim. (N.T. 11/13/13 at 107). He again noted that McGrail was interviewed extensively and was interviewed on more than one occasion. (N.T. 11/131/3 at 107). Moreover, he agreed that based upon the information he was given, the victim had left Perkins alone with the intention of returning home. (N.T. 11/13/13 at 107 – 08). He noted that when he packaged up the evidence, the rope, nightgown, and handkerchief were all packaged separately. (N.T. 11/13/13 at 109).

Scott Walsh testified next on behalf of the Commonwealth. He testified that Catherine Janet Walsh was his first wife. (N.T. 11/131/3 at 113 – 14). He stated that he met her in high school, and married her on August 14, 1976; he noted they were still married at the time of her

15

death. (N.T. 11/13/13 at 114 - 15). He explained that after they were married, they lived on Washington Avenue in Monaca in a house they purchased from his mother and father, and then moved to Ella Street in Monaca Heights in June of 1977. (N.T. 11/13/13 at 115). He asserted that when they lived on Ella Street, they were neighbors with Margie Farinacci. (N.T. 11/13/13 at 115). Furthermore, he testified that their houses were built by Colony Square Builders, and the Defendant was the builder. (N.T. 11/11/13 at 116). He testified that his first wife and Ms. Farinacci went out together and went shopping together, etc. (N.T. 11/13/13 at 117). He set forth that he knew that the Defendant had built his house and further noted that he met the Defendant once in Ms. Farinacci's driveway. (N.T. 11/13/13 at - 18). He further explained that he and the victim separated in December of 1978, got back together in early January of 1979, and then separated finally in late May or early June of 1979. (N.T. 11/13/13 at 117 - 18). He noted that they split up for financial reasons. (N.T. 11/13/13 at 118). He further noted that she had a job with Reliable Refrigeration, and he worked for St. Joe in Monaca at the time. (N.T. 11/13/13 at 118).

Walsh testified that during the separation, he and the victim still talked to each other and would call each other all the time. (N.T. 11/13/13 at 119). He further stated that when they separated, she moved out of the Ella Street home and moved to Indiana Avenue in Monaca. (N.T. 11/13/13 at 120). He denied having a key to her apartment on Indiana Avenue. (N.T. 11/13/13 at 121). He admitted that he had been to her apartment around three or four times while she was present. (N.T. 11/13/13 at 121). He noted that her sleeping attire usually consisted of a t-shirt and underwear. (N.T. 11/13/13 at 121). Further, Walsh denied having any sexual contact with her at the Indiana Avenue house. (N.T. 11/13/13 at 121 - 22). He described her as a tidy housekeeper and noted that she did her laundry every week. (N.T. 11/13/13 at 122). Regarding her bed sheets, Walsh stated that she would launder them either every week or every other week. (N.T. 11/13/13 at 122). He further noted that she would wear a bandanna when she was cleaning. (N.T. 11/13/13 at 123). Again, he noted that from the separation until the victim's death, he talked with Ms. Walsh at least two or three times per week. (N.T. 11/13/13 at 124). He further noted that for a period of time, Barbara Cindrich was living with the victim. (N.T. 11/13/13 at 124).

16

Walsh explained that he filed for divorce the first time they separated in November, but then he and the victim reconciled in December. (N.T. 11/13/13 at 125). He further asserted that the parties had a legal separation, and explained that as part of that separation, he gave her $75.00 per month in support on the first day of each month. (N.T. 11/13/13 at 126). He noted that the September 1st check may have been the first one, and further pointed out that he tried to give her the check in person. (N.T. 11/13/13 at 126).

Walsh relayed that he worked at St. Joe's on Friday, August 31, 1979, and further noted that he left around 11:00 or 12:00 that day; he noted that he had an appointment with an appraiser to get the Ella Street house appraised. (N.T. 11/13/13 at 127). He noted that he was meeting with the appraiser to begin the process of selling the house. (N.T. 11/13/13 at 129). He explained that after he met with the appraiser, he had plans with a friend of his named Jim Ross to go to a Beaver Falls - Blackhawk football game. (N.T. 11/13/13 at 130). He noted that he talked to the victim on the phone to let her know how the appraisal went, and he noted that the conversation ended with the victim telling him that she had signed his yearbooks. (N.T. 11/13/13 at 131 - 32). She had left a note for him and had been at the house earlier that day. (N.T. 11/13/13 at 132). He explained that he went to the yearbooks and looked at them. (N.T. 11/13/13 at 133). He identified his 1971, 1972, and 1973 Monaca Yearbooks and further identified the victim's handwriting and signature, noting that she had signed the notebooks with comments such as she would always love him and that they were "meant to be." (N.T. 11/13/13 at 133 – 37). He testified that the first time he saw those entries in his yearbooks was on August 31, 1979 prior to going out for the evening. (N.T. 11/13/13 at 137 - 38). He further stated that he saw the victim between 4:00 and 5:00 p.m., at the top of Ella Street, as she was coming around the bend to get to Margie Farinacci's house. (N.T. 11/13/13 at 130 – 31). He pointed out that they both rolled down their windows and had a brief conversation, and he asserted that she told him that she was going out to eat with Margie Farinacci. (N.T. 11/13/13 at 131).

He testified that he picked up his friend at his friend's home in Beaver Falls, Pennsylvania, and they went out to eat together at the C.W. Restaurant on Darlington Road. (N.T. 11/13/13 at 138 - 39). He explained that they then went to the Northwestern stadium for

17

the Blackhawk and Beaver Falls football game. (N.T. 11/13/13 at 139). He further relayed that on the way home, they stopped at a restaurant on Route 51 where they had a drink and ate something. (N.T. 11/13/13 at 139). He then pointed out that his friend became ill, and he ended up taking his friend to the Beaver Falls Hospital. (N.T. 11/13/13 at 140). He testified that they got there probably around 11:30, and stayed until after 1:00 waiting to be seen. (N.T. 11/13/13 at 140). Afterwards, Walsh stated that he took his friend home to his residence in Beaver Falls, and then went home to his house on Ella Street at around 2:00 a.m. (N.T. 11/13/13 at 140 - 41). He asserted that he was home for five to ten minutes when he received a phone call from Ilene Brenneman, a seventeen (17) year – old girl whom he was seeing at the time. (N.T. 11/13/13 at 141). They had a discussion about coming over; she then came to his house shortly after 2:00 a.m., and the two of them engaged in oral sex. (N.T. 11/13/13 at 141 – 42). He asserted that she left around 2:30 a.m., went up to the mall to get gas, then went to pick up her sister, and then went home. (N.T. 11/13/13 at 142). He testified that he had fallen asleep on the couch, and was awakened by a phone call from Ms. Brenneman around 3:30 a.m. (N.T. 11/13/13 at 142 – 43). He asserted that he then went back to sleep, and denied seeing Ms. Farinacci arrive home. (N.T. 11/13/13 at 143).

Walsh testified that he woke up the next morning around 9:00 or 9:30 a.m. (N.T. 11/13/13 at 143 - 44). He noted that he went to the Equibank in Beaver that morning to do some banking, and then went to the post office in Monaca around quarter to twelve. (N.T. 11/13/13 at 144). He noted that when he came into Monaca, he made a left on Indiana Avenue, and saw the victim's father, Mr. Caltury, walking down the street; he noted that he and Mr. Caltury waved. (N.T. 11/13/13 at 144). Next, Walsh testified that he arrived at the post office at around 11:55 a.m., and then went to the victim's house to give her a check. (N.T. 11/13/13 at 145). He noted that he knocked on her door twice, but there was no response. (N.T. 11/13/13 at 146). He explained that he had a check for her with him and a key ring for her. (N.T. 11/13/13 at 146). He further explained that about two or three days earlier while he was cutting grass in his yard in between his house and Margie Farinacci's house, he found a set of keys with a Reliable Refrigeration key chain. (N.T. 11/13/13 at 146 - 47). He noted that he put the check in the loop of the keychain, took the letter from the mail slot, and pushed them

18

all through the slot at around 12:05 p.m. (N.T. 11/13/13 at 147, 149). Walsh further explained that around 1:00 or a few minutes after 1:00, he got a phone call from the victim's father and was informed that the victim was deceased. (N.T. 11/13/13 at 150). He asserted that he went down to the Monaca Police Station, where he encountered the victim's mother and father. (N.T. 11/13/13 at 151). He then dropped the victim's parents off at the victim's home on Indiana Avenue and then went to the victim's parents' house for about two hours. (N.T. 11/13/13 at 152). He observed that there was a phone call from the Monaca police asking him to come down to the Monaca Police Department. (N.T. 11/13/13 at 152). He testified that he talked to the police, including Detective Andy Gall, and Trooper Matas, for around forty - five minutes. (N.T. 11/13/13 at 153). He asserted that he talked with them many times over the years. (N.T. 11/13/13 at 153). Finally, he denied killing his wife. (N.T. 11/13/13 at 155).

On cross, Walsh denied having sex with the victim during the parties' separation. (N.T. 11/13/13 at 156). He asserted that on the morning of September 1, 1979, he went to the Equibank in Beaver to cash a paycheck. (N.T. 11/13/13 at 164). He agreed that he married Deborah Lester on April 12, 1980. (N.T. 11/13/13 at 167 – 68). On re – direct, Walsh asserted that he met Ms. Lester on October 12, 1979. (N.T. 11/13/13 at 169).

Next, Francesco Caltieri, the victim's brother, was called to the stand. (N.T. 11/13/13 at 174). He identified his sister's handwriting and signature in Walsh's yearbooks. (N.T. 11/13/13 at 174 – 75). Ilene Rowan, formerly known as Ilene Brenneman, testified next on behalf of the Commonwealth. She relayed that on September 1, 1979, she called Scott Walsh and got a hold of him at around 2:00 a.m., and made plans with him to go over to his house located on Ella Street in Monaca. (N.T. 11/13/13 at 177 - 78). She asserted that she arrived there at around five or ten minutes after 2:00 a.m. (N.T. 11/13/13 at 178). She noted that she left around 2:50 a.m. and further admitted that something sexual probably happened while she was there. (N.T. 11/13/13 at 179). She asserted that after she left his residence she went back to her friend's house to pick up her sister, and then went home. (N.T. 11/13/13 at 179). She pointed out that she called Walsh to tell him that she got home at around 3:45 or 4:00 a.m., and further noted that he was sleeping when he answered the phone. (N.T. 11/13/13 at 179 - 80).

Robert McGrail testified next on behalf of the Commonwealth. He noted that he is sixty – four (64) years old and resides in Saugus, Massachusetts. (N.T. 11/14/13 at 17). He asserted that in the late 1970's, he lived on Brodhead Road in Beaver County, and noted that the Penn State Beaver Campus abutted his property. (N.T. 11/14/13 at 17-18). He further noted that he worked at Ciro's Top of the Mall restaurant and Woolworth's at the mall. (N.T. 11/14/13 at 18 – 19). He noted that he did not have a car in August or early September of 1979. (N.T. 11/14/13 at 19).

McGrail testified that on the night of August 31, 1979, he went out that night with his friend Al Awad to the Getaway, and noted that his friend picked him up and took him there. (N.T. 11/14/13 at 20 – 21). He testified that he met the victim because he approached her and asked her to dance while she was at a table with some friends. (N.T. 11/14/13 at 22). He relayed that he danced with the victim several times and also spoke with her; his friend Al Awad left early. (N.T. 11/14/13 at 23 – 24). He relayed that when he asked the victim for a ride home, she told him she was going to Perkins, which was located within walking distance in the mall area. (N.T. 11/14/13 at 24). He noted that when he got to Perkins, he sat down with her, and upon asking her for a ride home, she commented that she was going through a divorce, her husband was jealous, and she never knew when her husband would show up. (N.T. 11/14/13 at 25). He testified that she more or less asked him to leave, and he then got up from the table. (N.T. 11/14/13 at 25). He noted that he then sat down with a girl named "Liz" with whom he worked. (N.T. 11/14/13 at 26). He asserted that he ordered something to eat and had a conversation with Liz, and left after he finished what he had ordered. (N.T. 11/14/13 at 26 - 28). He stated that he then walked through the parking lot of Perkins and walked up a steep hill, down the hill and across a creek to get home. (N.T. 11/14/13 at 28 – 29). He asserted that he then went to bed and fell asleep. (N.T. 11/14/13 at 29). He explained that he was awakened by the police, and he then went to the Monaca police station with the police and was questioned by them. (N.T. 11/14/13 at 29 - 30). He noted that they brought him home after he was questioned. (N.T. 11/14/13 at 30 – 31). He asserted that at his second meeting with the police, they asked him to identify his checkbook. (N.T. 11/14/13 at 31). He asserted that he did not know it was missing until they showed it to him. (N.T. 11/14/13 at 32).

He explained that he thought he had it with him the night he went out, and had placed it in the side pocket of his sport coat. (N.T. 11/14/13 at 32). He further agreed that he had been dating a girl, Sandra Henry, who lived in Rochester, Pennsylvania, and whom he had met at the Infinity Club in Rochester, Pennsylvania. (N.T. 11/14/13 at 33).

On cross, McGrail reiterated his testimony on direct. He agreed that he slept in late on September 1, 1979 due the fact that he had a hangover, and was awakened when the police came to his door at 4:00 p.m. (N.T. 11/14/13 at 37). He again noted that when he left Perkins he walked up the hill behind the Gee Bee plaza. (N.T. 11/14/13 at 46). He noted that he didn't report the checkbook as having been stolen because he didn't know he had lost it until it was presented to him at the police station around September 10, 1979. (N.T. 11/14/13 at 52 - 53). On re – direct, he testified that he had no idea where the victim lived, as he had just met her. (N.T. 11/14/13 at 54).

Detective Andrew Gall was then recalled to the stand. He explained that none of the suspects were eliminated until after the police knew who committed the crime and the person was charged. (N.T. 11/14/13 at 57). He pointed out that the police talked to Scott Walsh at 4:50 in the afternoon on September 1, 1979. (N.T. 11/14/13 at 59). He testified that he spoke to Scott Walsh ten times over the course of the investigation, and noted that the second interview with Scott Walsh occurred on September 12, 1979. (N.T. 11/14/13 at 61). He noted that on September 15, 1979, he and Patrolman Kovac, Scott Walsh and Pete Caltury removed a blue terrycloth robe, a maroon terrycloth robe and $44.00 in cash from the victim's apartment. (N.T. 11/14/13 at 62). He further asserted that he had found out through his investigation that when the victim and Scott Walsh got married, they resided in a house given to them by Scott's parents on Washington Avenue, and then sold that house to pay for the house on Ella Street; when the house was sold, Walsh split the proceeds with the Caltury family. (N.T. 11/14/13 at 66). He further noted that Scott Walsh provided the police with a Buccal swab. (N.T. 11/14/13 at 67). Finally, he explained that the DNA found at the scene on the nightgown, robe tie, and the sheets did not belong to Scott Walsh. (N.T. 11/14/13 at 67). He further agreed that he had interviewed McGail along with Detective Cashdollar, Chief Conti, Detective Hart and Trooper Matas when McGrail was brought down to the police station at 4:20 on September 1, 1979.

21

(N.T. 11/14/13 at 68 - 69). He explained that the detectives of the D.A.'s office had brought a small handheld tape recorder with them and recorded the interview with McGrail. (N.T. 11/14/13 at 69). After the interview was over, the tape was taken back to the D.A.'s and was transcribed; however, nobody knew what happened to the tapes. (N.T. 11/14/13 at 70). He noted that McGrail had informed them that Ms. Walsh had been wearing slacks, but in fact she had been wearing a dress that had been found on the ironing board in her bedroom. (N.T. 11/14/13 at 73). He further relayed that they met with McGrail again on September 20, 2014 regarding the checkbook. (N.T. 11/14/13 at 73). He testified that on September 7, 1979, Wanda Jesky found the checkbook lying in the gutter on Ninth Street, which is the street that runs from downtown Monaca to the Monaca – Rochester Bridge. (N.T. 11/14/13 at 74). He noted that he was present when McGrail was videotaped during the interview in Massachusetts. (N.T. 11/14/13 at 80). Detective Gall testified that McGrail provided the same account of what had occurred when he spoke to the police in Massachusetts as when he had been interviewed in 1979. (N.T. 11/14/13 at 81). He further relayed that McGrail provided a Buccal swab. (N.T. 11/14/13 at 81 – 84). He noted that the sample was sent to the Pennsylvania State Police Crime Lab, and the lab determined that McGrail's DNA did not match any of the DNA found at the scene. (N.T. 11/14/13 at 85).

On cross, Detective Gall reiterated that when he was interviewed in Massachusetts, McGrail told pretty much the same version of events as he had told the police on September 1, 1979. (N.T. 11/14/13 at 86). He agreed that the interview in Massachusetts was in December of 2011. (N.T. 11/14/13 at 89). He reiterated that the checkbook was found nine houses from 935 Indiana Avenue. (N.T. 11/14/13 at 90). He further relayed that after the police told McGrail that they had a search warrant, McGrail replied that they didn't need the search warrant because he would gladly give them the sample. (N.T. 11/14/13 at 93). Detective Gall agreed that the defense expert's report indicated that Scott Walsh's DNA was found on the sheets. (N.T. 11/14/13 at 95 - 96).

Regarding the interviews, Detective Gall testified that the police interviewed Scott Walsh on September 19, 1979 from 5:00 until 7:30, and agreed that his notes set forth that Scott Walsh had explained why he had originally lied about Irene Brenneman, but further noted

22

that there was no new information given. (N.T. 11/14/13 at 97 - 98). He further agreed that the interview with Scott Walsh was taped but not transcribed. (N.T. 11/14/13 at 98 - 99). He also agreed that he had learned from Scott Walsh on September 1, 1979 that Mr. Walsh had learned from Barbara Cindrich that morning that his wife had been seeing the Defendant. (N.T. 11/14/13 at 102). On re – direct, Detective Gall set forth that Scott Walsh had always indicated that he did not know if Janet Walsh was dating anyone. (N.T. 11/14/13 at 107). He again reiterated that Walsh found out the morning of September 1, 1979 that the victim had been seeing the Defendant. (N.T. 11/14/13 at 109 - 10). Further, Detective Gall agreed that the report of the defense expert found only the Defendant's DNA on the nightgown and the robe tie. (N.T. 11/14/13 at 113).

On further re – redirect, Detective Gall asserted that when interviews were recorded, a small cassette recorder would be placed in the middle of the room with police officers around, and then after the interview was over, the tape was returned to the D.A.'s office where it would be transcribed by a secretary. (N.T. 11/14/13 at 118). He further agreed that the secretaries were not trained stenographers, and there would be gaps in the transcriptions. (N.T. 11/14/13 at 117 - 18).

Next, Francesco Caltieri again was recalled to the stand, and noted that his sister never expressed to him that Scott Walsh had ever been violent toward her. (N.T. 11/14/13 at 123 - 24).

Lou Scarsella testified next on behalf of the Commonwealth. He noted that he is a self – employed trim carpenter. (N.T. 11/14/13 at 125). He testified that he worked for Colony Square Builders from 1977 until 1980, and his boss was the Defendant. (N.T. 11/14/13 at 125). Afterwards, he worked for Cabinet Warehouse, and noted that he put in the cabinets in the kitchen of Pete Caltury and his wife's house in Monaca, Pennsylvania. (N.T. 11/14/13 at 125 – 26). He noted that he worked on the kitchen in their home in the early 1990's, and had conversations with the Calturys about the death of their daughter. (N.T. 11/14/13 at 127). He asserted that two weeks after he worked on the Calturys' kitchen, he had a conversation with the Defendant at the warehouse when the Defendant approached him and asked what the police had talked to him about. (N.T. 11/14/13 at 127). He noted that the Defendant appeared

23

to be nervous. (N.T. 11/14/13 at 127). Further, Scarsella asserted that he told the Defendant that he did not speak to the police; the police spoke to his wife. (N.T. 11/14/13 at 127). He further testified that the Defendant had a partner, Larry Musgrave, who had called Scarsella's mother to find out his phone number. (N.T. 11/14/13 at 128). Scarsella asserted that he called Musgrave, and noted that Musgrave wanted him to get in touch with CSI to find out what they thought Scarsella knew. (N.T. 11/14/13 at 128). On cross, Scarsella testified that he first heard about the victim's death when he learned about it from Mr. and Mrs. Caltury. (N.T. 11/14/13 at 129). He set forth that he was at the Defendant's model home on the date of the pig roast on September 1, 2014. (N.T. 11/14/13 at 129). He asserted that he never spoke to the Defendant again after the day he had talked to the Defendant at the warehouse. (N.T. 11/14/13 at 130).

Next, Trooper Rocco DeMaiolo testified on behalf of the Commonwealth. He noted that he is a retired Pennsylvania State Trooper and served as a State Trooper for almost twenty – six (26) years; he also noted that he spent fifteen (15) years as a criminal investigator in the Beaver Barracks. (N.T. 11/14/13 at 131 – 32). He asserted that when he was assigned to the unit on April 19, 1997, he was assigned cold cases, including the case at hand. (N.T. 11/14/13 at 133). Regarding this matter, he testified that he reviewed the reports from the Beaver County Detectives, Monaca Police, the Pennsylvania State Police, and the original crime scene photos. (N. T. 11/14/13 at 135). He explained that Trooper Matas was in charge of the case from September 1, 1979 until early 1980; Trooper Francis Keenan then had the case for the next ten years and is now deceased. (N.T. 11/14/13 at 136). He noted that next Trooper Bert Failor had the case. (N.T. 11/14/13 at 136). He agreed that they could not locate McGrail's checkbook and pointed out that it had not been turned over to the State Police. (N.T. 11/14/13 at 137). He noted that the other items of evidence were held at the Chippewa Barracks and then were moved to the Brighton Township Barracks when the State Police moved there. (N.T. 11/14/13 at 137). He relayed that in June of 2000, it was decided that this case would be part of a cold case investigation. (N.T. 11/14/13 at 139 - 40). He stated that DNA would not have been an option until around 1989. (N.T. 11/14/13 at 141). He noted that sometime after 2001, he had the opportunity to discuss the matter with Chris Arrotti from the Serology Department and Christine Thomsey from the DNA Department, and it was decided that they would try to get a

24

DNA standard from the victim; a cut − out portion of a bloodstain from the pillow case and a piece of the handkerchief were also submitted. (N.T. 11/14/13 at 144 − 46). He noted, however, that the sample was insufficient to get a DNA standard. (N.T. 11/14/13 at 145).

Trooper DeMaiolo testified that the evidence was stored in the evidence room at the Barracks, which is secured by locked doors. (N.T 11/14/13 at 147). He further explained that the Crime Unit Supervisor is the custodian of the evidence room. (N.T. 11/14/13 at 147). He further explained that only the Crime Unit Supervisor and the evidence custodian can get into the evidence room after the evidence is moved there from the receiving lockers. (N.T. 11/14/13 at 147 − 48). He noted that the evidence room is only utilized to take evidence in and out. (N.T. 11/14/13 at 148). He testified that in 2010, Sergeant Douglas Barto arranged a meeting at the Greensburg Regional Crime Lab with Trooper DeMaiolo, Detective Gall, Corporal Lalama, and Sergeant Barto to go over the evidence with Sarah Kinneer, a serology supervisor. (N.T. 11/14/13 at 149). He noted that she determined that with the alternate light source technology, they could look over Plankenhorn's original findings. (N.T. 11/14/13 at 149 - 50). He further testified that Ashlee Mangan called him a few months later and informed him that the lab had found semen on the bed sheets, the back of the nightie, and the bathrobe rope tying the victim's hands. (N.T. 11/14/13 at 150 - 51).

On cross, Trooper DeMaiolo agreed that a September 15, 1981 report by Trooper Keenan revealed that Scott Walsh's check from the St. Joe Zinc Company had the date of September 4, 1979 and the notation of the National Bank of Beaver County on the back. (N.T. 11/14/13 at 155). He agreed that the oral swab and vaginal swab of the victim had come back negative. (N.T. 11/14/13 at 161). He further noted that in accordance with his May 6, 2005 report, he had a discussion with Chris Arrotti, and had later submitted the blue bandanna for testing. (N.T. 11/14/13 at 162). He agreed that the lab could not find trace evidence on it. (N.T. 11/14/13 at 163). He further reiterated that in October of 2010, he and other investigators met with Sarah Kinneer, and they went through the crime scene photos and then physically went through the evidence. (N.T. 11/14/13 at 163 - 64). He agreed that the police left certain items at the lab for testing: the sheets, the nightshirt, the ligature, and the robe tie. (N.T. 11/14/13 at 166). He agreed that he did not leave the clothes the victim had been

25

wearing that night of the incident with the lab. (N.T. 11/14/123 at 166 – 67). He noted that it was his understanding that the lab was going to use an alternate light source to look for sperm and other bodily fluids. (N.T. 11/14/13 at 168). On re – direct, Trooper DeMaiolo testified that his opinion that Scott Walsh was being deceptive changed after Walsh cleared up what had happened with Ilene Brenneman. (N.T. 11/14/13 at 170). Further, he pointed out that the DNA on the nightgown and the rope matched the Defendant. (N.T. 11/14/13 at 171).

Vickie McDaniels testified next on behalf of the Commonwealth. She asserted that her last name used to be Reddinger. (N.T. 11/14/13 at 173). She stated that she had been employed as the Borough Secretary of Bridgewater since 1998. (N.T. 11/14/13 at 173 – 74). She testified that she knew Gregory Hopkins as a Councilman in Bridgewater in 2010. McDaniels explained that she had a conversation with Chief Adams wherein he asked her to bring the waste basket from the entry hall of the Borough Building into her office and call the Chief if the Defendant were to come in on Borough business, drink water from the Polar water container, and throw the cup away. (N.T. 11/14/13 at 174 – 76). Further, she noted that Chief Adams had asked her to keep the trash can liner free and clear of waste, which she did. (N.T. 11/14/13 at 176). She relayed that the conversation occurred in the summer months. (N.T. 11/14/13 at 175).

She noted that on a Friday in August of 2011, the Defendant came into her office to discuss Borough business. (N.T. 11/14/13 at 177). She explained that the Defendant ate some of the candy she had sitting out, and then went into the hall and got a drink of water from the water cooler; he then came back into her office. (N.T. 11/14/13 at 177). She then explained that after they finished the conversation, he left, and he threw his cup in the trash can. (N.T. 11/14/13 at 177). She testified that she then immediately went into the hallway and took the waste basket and brought it into her office; she then called Chief Adams. (N.T. 11/14/13 at 177).

Chief Douglas Adams testified next on behalf of the Commonwealth. He asserted that he has served as Chief of the Borough of Bridgewater Police Department for eight years. (N.T. 11/14/13 at 181). He noted that in 2011, he had a conversation with Detective Andrew Gall about retrieving certain cups. (N.T. 11/14/13 at 181). He asserted that he asked the Borough

26

Secretary to retrieve the cups. (N.T. 11/14/13 at 181). He explained that on August 19, 2011, the Borough Secretary called him, so he went back to the police station and took possession of the garbage can in which the Defendant had thrown the cups. (N.T./14/13 at 182 – 83). He noted that she had the garbage can in her office by her desk. (N.T. 11/14/13 at 183). He further explained that after he received the garbage can, he took it into his office and removed the two plastic cups from the garbage can and put them into a brown paper bag. (N.T. 11/14/13 at 186). He noted that he then contacted Detective Gall by phone, and then turned the bag over to him. (N.T. 11/14/13 at 186).

Trooper DeMaiolo took the stand again and identified Exhibit 46 as the chain of custody as to the items of evidence in this case, ranging from 1979 through 2012. (N.T. 11/14/13 at 188). He agreed that he and Detective Gall had a conversation with the Defendant in June of 2011, wherein they let him know that the police were revisiting the investigation. (N.T. 11/14/13 at 189). He relayed that the Defendant told them that on August 31, 1979, he had been at his residence, which was a model home in Center Township, and had been preparing for a pig roast for his employees. (N.T. 11/14/13 at 189 – 90). DeMaiolo further stated that the Defendant admitted that he and victim were involved in a casual relationship and admitted to having been to her apartment. (N.T. 11/14/13 at 190). Further, DeMaiolo asserted that the Defendant had stated that the last time he was at the victim's apartment was three to four weeks prior to her death. (N.T. 11/14/13 at 190). DeMaiolo further explained that the Defendant had admitted to a sexual relationship with the victim and had further admitted to having sex with her two or three times at her apartment at 935 Indiana Avenue. (N.T. 11/14/13 at 190). He noted that the Defendant relayed each time he visited her, he stayed for a couple of hours, and the two of them discussed their separations from their spouses. (N.T. 11/14/13 at 191).

Trooper DeMaiolo further testified that he brought the cups retrieved by Chief Adams and given to Detective Gall to the lab. (N.T. 11/14/13 at 191 – 92). He testified that the results of the lab's DNA testing indicated that the Defendant's DNA from the cups matched the DNA found on some of the items of evidence. (N.T. 11/14/13 at 192). As such, Trooper DeMaiolo applied the lab's findings in his Affidavit for a search warrant, and then he received a DNA

27

sample for a confirmatory analysis, which was submitted to the Crime Lab. (N.T. 11/14/13 at 193). Trooper DeMaiolo asserted that the confirmatory analysis results regarding the Defendant's DNA matched the DNA found on some of the items of evidence. (N.T. 11/14/13 at 193).

On cross, Trooper DeMaiolo asserted that the Defendant admitted to having a sexual relationship with the victim from his first interview with the police on September 1. 1979. (11/14/13 at 194 – 95). He noted that when he interviewed the Defendant again on September 26, 1979, he again admitted to having a sexual relationship with the victim and stated that he had been at the victim's residence three or four times. (N.T. 11/14/13 at 196). He agreed that pursuant to the lab report dated April 4, 2011, the only things tested for DNA were the nightgown and robe tie; he then requested that the lab test the fitted sheet for DNA. (N.T. 11/14/13 at 199 – 202). He agreed that the lab couldn't match anything from the fitted sheet to the DNA found on the back of the nightgown and robe tie. (N.T. 11/14/13 at 202).

On re – direct, Trooper DeMaiolo pointed out that he was aware of the fact that the Lab had found the Defendant's DNA profile on the flat sheet. (N.T. 11/14/13 at 205). He noted that when the victim was discovered, she was found lying on her stomach with her hands bound behind her back and the ligature tied around her neck. (N.T. 11/14/13 at 205). Trooper DeMaiolo explained that given the position in which she was found, the DNA found on the nightgown, robe tie binding her hands and sheet lying on top of her would point to the actor. (N.T. 11/14/13 at 206).

Detective Andrew Gall was recalled to the stand. He identified the drinking cups utilized and thrown out by the Defendant. (N.T. 11/14/13 at 208). He stated that he took possession of them on August 19, 2011, drove them to the temporary evidence lock – up at the District Attorney's office, and then turned them over to Corporal Hugar of the State Police. (N.T. 11/14/13 at 208). He explained that MGrail and Walsh were eliminated from suspicion because of the DNA evidence. (N.T. 11/14/13 at 209). He noted that Ron Ciccozzi, who was the victim's boss, was eliminated due to evidence obtained from a Buccal swab. (N.T. 11/14/13 at 209). He further explained that when the police got the lab results back from the testing of the flat

28

bed sheet, the Defendant's DNA was found on the left side of the bed sheet, under which the victim's body was located. (N.T. 11/14/13 at 212).

Detective Gall testified that the model home in which the Defendant resided was located right off the Route 376 exit, which used to be Route 60. He noted that it is 6.3 miles from the model home to 935 Indiana Avenue. (N.T. 11/14/13 at 213). He agreed stated that it took ten minutes in heavier traffic to drive to 935 Indiana Avenue from the model home. (N.T. 11/14/13 at 213). He also agreed that in the September 1, 1979 interview with the Defendant, he admitted to having a relationship with the victim. (N.T. 11/14/13 at 214). However, he noted that when the Defendant was first interviewed, he stated that he only knew the victim to see her and had talked to her. (N.T. 11/14/13 at 217). Later, the Defendant admitted that he had seen her a few times, but said they were not good friends and he was not dating her. (N.T. 11/14/13 at 217). The Defendant also admitted that he had talked to her on the phone and she had stopped down and talked to him a couple of times. (N.T. 11/14/13 at 219). Detective Gall testified that the Defendant admitted that the last time he had been at her house was three or four weeks earlier. (N.T. 11/14/13 at 219). Next, Detective Gall noted that the Defendant then admitted to engaging in sexual relations with the victim. (N.T. 11/14/13 at 220). Detective Gall then noted that the Defendant admitted to seeing the victim a couple of times, but asserted that there was no emotional involvement. (N.T. 11/4/13 at 221). Detective Gall then noted that the Defendant explained that he was divorced but was seeing someone. (N.T. 11/14/13 at 221). Detective Gall testified that the Defendant then stated that he had three witnesses who were with him the previous night. (N.T. 11/14/13 at 222). Detective Gall asserted that the Defendant stated that he had been at his office from 8:00 p.m. until 11:00, except maybe to run an errand. (N.T. 11/14/13 at 222). He noted that until around 11:00, they were running around and coming back, getting ready for a pig roast. (N.T. 11/14/13 at 222 – 23). Detective Gall noted that when the Defendant was asked when the latest time was that he was at the victim's house, he asserted 1:30 or 2:00. (N.T. 11/14/13 at 223). Further, Detective Gall noted that the Defendant stated that Larry Musgrave, Goergeann Musgrave, and Dianne St. George were at his office the previous night. (N.T. 11/14/13 at 223). Detective Gall revealed that the Defendant told them that they prepared for the pig roast until around 1:00 or 1:30, and then

29

got up around 6:00; they put the pig on the fire around 7:30 a.m. (N.T. 11/14/13 at 225). Detective Gall further indicated that when the Defendant was asked if he knew whether the victim was seeing anyone, he informed the police that she had told him she wasn't seeing anyone because of her separation; however, he noted that if he was lonely at night she would call him to talk. (N.T. 11/14/13 at 225 – 26). Detective Gall further noted that the Defendant reiterated that all three of his friends (the Musgraves and Dianne St. George) were with him the previous night. (N.T. 11/14/13 at 227). Detective Gall noted that the Defendant then informed them that he hadn't spoken with the victim for two or three weeks and again reiterated that he was only at 935 Indiana Avenue two or three times. (N.T. 11/14/13 at 227 - 28). Detective Gall further asserted that the Defendant explained that he met the victim through Margie Farinacci, who worked for him. (N.T. 11/14/13 at 228). Further, Detective Gall set forth that the Defendant noted that there were a few times that the victim and Margie Farinacci had drinks with the Defendant and Larry Musgrave at the Holiday Inn. (N.T. 11/14/13 at 229 - 30). Further, Detective Gall noted that Detective Bernie Cashdollar did the questioning, and he is now deceased. (N.T. 11/14/13 at 231). Later, the Defendant corrected Detective Cashdollar and asserted that the last time he had seen the victim was three or four weeks ago, and the last time he talked to her on the phone was a week ago, when he had called her at around 11:00 or 12:00. (N.T. 11/14/13 at 233 - 34). Detective Gall pointed out that the Defendant explained that he had heard about the victim's death when Joey Farinacci called and informed him that he and his wife would not be attending the pig roast because Margie had learned of the victim's death. (N.T. 11/14/13 at 235 - 36).

On cross, Detective Gall asserted that there is no tape available for the interview he had testified about. (N.T. 11/14/13 at 242). Further, he asserted that the Defendant denied having a key to the victim's apartment. (N.T. 11/14/13 at 246). He again noted that the Defendant stated that they started the fire for the pig roast at 6:00 and put the pig on at 7:00 or 7:30 a.m. (N.T. 11/14/13 at 246). Detective Gall agreed that the interview occurred at 7:30 p.m. on September 1, 1979. (N.T. 11/14/13 at 246). He agreed that he brought the Defendant back for questioning on September 26, 1979. (N.T. 11/14/13 at 248). He noted that on that date, the Defendant informed him that he had visited the victim three or four times and was involved in a

30

casual relationship with her. (N.T. 11/14/13 at 248). He further set forth that they interviewed Larry Musgrave. (N.T. 11/14/13 at 249). He agreed that there was no sign of forced entry at the victim's residence. (N.T. 11/14/13 at 254). On re – direct, Detective Gall reiterated that the seminal fluid that was found on the victim's nightgown and the robe tie tied around her wrists matched the Defendant. (N.T. 11/14/13 at 256). He further agreed that the police found out through Barbie Cindrich that the Defendant had been involved in a relationship with the victim. (N.T. 11/14/13 at 257). He further agreed that when the Defendant was first interviewed on September 1, 1979, the Defendant had stated that he had seen the victim around two times, but later changed his story on September 26, 1979 when he was re – interviewed by himself and Trooper Matas and stated that he had seen the victim three or four times. (N.T. 11/14/13 at 257).

Next, Corporal Robert A. Lalama testified on behalf of the Commonwealth. He asserted that he has worked for the Pennsylvania State Police for twenty – two (22) years. (N.T. 11/14/13 at 260). He noted that he is the supervisor of the Criminal Investigation Unit at the Beaver Station. (N.T. 11/14/13 at 260). He testified that he had been Trooper DeMaiolo's supervisor and was familiar with this case. (N.T. 11/14/13 at 260). He explained that the evidence room has a single manner of access, and the shift supervisor has a key. (N.T. 11/14/13 at 261). He further explained that the supervisor would first unlock the first door, and then the door would be closed and secured; then there is a steel door with a double dead bolt and a regular hand lock. (N.T. 11/14/13 at 261 – 62). He further explained that only himself or whoever was acting as the evidence officer, and the other would have been the Station Commander could access the inner area of the evidence room. (N.T. 11/14/13 at 262). He stated that he was the evidence officer from the end of 2002 or the beginning of 2003 until the present time, except for a short period of time when Corporal Eric Sipes held that position. (N.T. 11/14/13 at 262). He noted that the defense was permitted access in this case while he was present. (N.T. 11/14/13 at 263). He noted that the evidence room shares the heating and air conditioning with the rest of the building. (N.T. 11/14/13 at 264). He testified that the evidence room was where the evidence from this case stayed after it was moved to the

31

Brighton Township Barracks. (N.T. 11/14/13 at 264). On cross, Coporal Lalama agreed that in 2010, evidence from this case was taken by him to the lab. (N.T. 11/14/13 at 266).

The Commonwealth called Chris Ann Arrotti to the stand. Arrotti testified that she is employed as the forensic laboratory manager at the Greensburg Regional Crime who is charged with the task of overseeing the budget, taking care of the facility, and ensuring that the laboratory maintain all of the policies and procedures in order to maintain accredited status. (N.T. 11/15/13 at 4 - 5). Regarding her educational background, Arrotti asserted that she has a bachelors degree in biology from Seton Hill College and a minor in chemistry, as well as a secondary teaching certificate in biology and chemistry. (N.T. 11/15/13, at 5 - 6). She noted that she taught advanced chemistry in high school and college and then began working for the Pennsylvania State Police as a serologist and a trace analyst in January of 1992. (N.T. 11/15/13 at 5). Regarding her work as a serologist, she pointed out that her daily work included looking at evidence received for physiological strains, and analyzing items such as hair and fibers, until around 2000. (N.T. 11/15/13 at 6). She then worked there as a supervisor. (N.T. 11/15/13 at 6). She noted that she became a laboratory manager in July of 2007. (N.T. 11/15/13 at 7).

Arrotti testified that the Pennsylvania State Police Lab where she works was accredited in 2002 through ASCLD Laboratories. (N.T. 11/15/13 at 8). She noted that in May of 2012, the lab received ISO accreditation, which is more stringent. (N.T. 11/15/13 at 8). She pointed out that every year the lab is audited. (N.T. 11/15/13 at 8).

Arrotti agreed that she knew Ralph Plankenhorn, and asserted that he is now deceased. (N.T. 11/15/13 at 9). She identified Commonwealth Exhibit No. 49, the Lab Report and a Supplemental Lab Report, as being related to this case and as being authored by Plankenhorn. (N.T. 11/15/13 at 10 - 11). Arrotti explained that the lab is not permitted to re - test a stain. (N.T. 11/15/13 at 13). She further explained that when using an alternate light source, the serologist will change the wave length of the item in order to identify potential stains due to their ability to fluoresce. (N.T. at 11/15/13 at 13). She noted that saliva and seminal material may fluoresce. (N.T. at 11/15/13 at 13). She further pointed out that pinks, oranges and reds will fluoresce. (N.T. 11/15/13 at 13). She further explained that one of the approaches with a

32

cold case is to utilize an alternate light source on the evidence. (N.T. 11/15/13 at 13 - 14). She testified that the lab acquired its first alternate light source in 1994. (N.T. 11/15/13 at 14).

On cross, Arrotti noted that in the 1970's, Plankenhorn was a generalist. (N.T. 11/15/13 at 15). She further asserted that he was employed by the Lab from 1979 until after 1992. (N.T. 11/15/13 at 16). She agreed that she received nine items for review in relation to the case at hand. (N.T. 11/15/13 at 18). She further agreed that a sexual assault kit was submitted in connection with this case. (N.T. 11/15/13 at 18). She noted that back in 1979, a serologist would look at the evidence for stains, and if he or she did not see anything with the naked eye, the criminologist would run his or hands, gloved or otherwise, over the items in order to find a stain. (N.T. 11/15/13 at 20). Arrotti further noted that the Plankerhorn report asserted that there was "[n]o observable foreign trace evidence." (N/T/ 11/15/13 at 21).

Arrotti further explained that in the 1990's, the Pennsylvania State Police began to utilize an alternate light source in order to ascertain items that fluoresced or were a different appearance. (N.T. 11/15/13 at 22). She testified that the two primary stains one could locate with the alternate light source were saliva and seminal materials. (N.T. 11/15/13 at 23). She further noted that she did not perform any analysis on the immediate case at all. (N.T. 11/15/13 at 25). Regarding this case, she asserted that it was decided that the light blue bandanna ligature presented the best possibility for trace DNA from the actor. (N.T. 11/15/13 at 25). She pointed out that the decision was made in conjunction with Christine Tomsey, the director of the DNA lab. (N.T. 11/15/13 at 26).

On re-direct, Arrotti noted that sometimes she would be able to see some stains visibly that she would circle and then she would turn on the alternate light source and would be able to see additional stains. (N.T. 11/15/13 at 27 - 28). She noted that sometimes some of the stains that she saw visually would be positive for semen, and some would be negative; some of the fluorescent stains would be positive for semen and some would be negative. (N.T. 11/15/13 at 28).

Ashlee Mangan testified next on behalf of the Commonwealth. She stated that she is employed by the Pennsylvania State Police Bureau of Forensic Services at the Greensburg Regional Crime Laboratory, and has been employed as such for five and a half years. (N.T.

33

11/15/13 at 32 - 33). She testified that she is a forensic scientist in the serology section. (N.T. 11/15/13 at 33). She noted that she has a bachelor of science in chemistry from Carlow University, and has worked as a chemistry technician at the Pennsylvania State Police Crime Lab and a serologist. (N.T. 11/15/13 at 32 - 33). She noted that when she started working for the lab, Chris Arrotti was the crime laboratory manager. (N.T. 11/15/13 at 34). She testified that the Pennsylvania State Police Laboratory is Accredited by the American Society of Crime Laboratory Directors Lab Accreditation Board. (N.T. 11/15/13 at 35 - 36). She further pointed out that the lab undergoes internal audits once a year, and also undergoes outside audits once every five years. (N.T. 11/15/13 at 36). She noted that as a serologist, she worked on about 500 cases and 1800 items, and further asserted that she has been recognized as an expert by the Commonwealth of Pennsylvania fourteen (14) times. (N.T. 11/15/13 at 36). She was then qualified as an expert in the field of serology. (N.T. 11/15/13 at 39).

Mangan testified that serology involves fluid identification and the analysis of items of evidence that are submitted to the lab by law enforcement for bodily fluids. (N.T. 11/15/13 at 40). She explained that she identifies blood, semen, saliva, urine and fecal material. (N.T. 11/15/13 at 40). She further noted that she assists in blood stain pattern analysis at crime scenes, from photographs, and on items of evidence. (N.T. 11/15/13 at 40). She relayed that when a case is submitted to the laboratory, law enforcement brings it in and it is assigned a lab number. (N.T. 11/15/13 at 40 - 41). She notes that she documents the packaging and then cleans the bench area and utensils. (N.T. 11/15/13 at 41). She then processes one item at a time while cleaning the bench space between items and putting brown paper down and cleaning it prior to analyzing a particular item. (N.T. 11/15/13 at 41). She noted that when she opens up an item, she looks for trace evidence such as hair, debris, and fibers, and then documents the visible stains that are there. (N.T. 11/15/13 at 41 - 42). She further explained that she then marks the evidence with a lab number, an item number, and her initials. (N.T. 11/15/13 at 42). She testified that she uses an alternate light source, or ALS, which is a portable light source with a flexible extension light. (N.T. 11/15/13 at 42). She relayed that she used it in a darkened room and wore goggles for eye protection. (N.T. 11/15/13 at 42). She

34

asserted that she would search items of evidence for staining, which would glow, and she would circle the stain in order to mark it for future testing. (N.T. 11/15/13 at 42).

Mangan further explained why the forensic scientists utilize alternate light source, noting that some bodily fluids are not visible to the naked eye. (N.T. 11/15/13 at 42). She noted that sometimes seminal material or saliva may not be readily visible. (N.T. 11/15/13 at 42-43). She asserted that as soon as an item is received, it is logged into the computer system and receives a case number and gets locked up into a long term storage vault where it is secured. (N.T. 11/15/13 at 43). She asserted that when the evidence is taken into her custody, she is either working on it, or it is in the secure locker that only she has access to. (N.T. 11/15/13 at 43). She explained that when she is finished with the item, it goes back to a secure location, and the evidence techs take it and put it back into long term storage. (N.T. 11/15/13 at 43). She further relayed that when looking at a piece of evidence, her goal is to either identify or detect bodily fluids that may be on the items of evidence. (N.T. 11/15/13 at 44). She noted that if she detected bodily fluids on the evidence, she would prepare samples for subsequent analysis. (N.T. 11/15/13 at 44). She further explained that she would cut the sample out, place it in a clean envelope, seal it, and place it in a heat – sealed plastic container. (N.T. 11/15/13 at 44).

Mangan testified that she recalled being involved in the case involving Catherine Janet Walsh in 2010. (N.T. 11/15/13 at 45). She asserted that after she is assigned a case, she looks up the information provided and goes through the evidence there. (N.T. 11/15/13 at 45). She testified that she was provided with the case information, previous lab reports, and the previous autopsy report. (N.T. 11/15/13 at 45 - 46). She stated that she would then analyze pieces of evidence, and further pointed out that she started working on this case on November 15, 2010. (N.T. 11/15/13 at 46).

Mangan identified Commonwealth's Exhibit 39, and noted that the outer packaging was marked with her initials, the case number and the item number. (N.T. 11/15/13 at 47). She further noted that the envelope was sealed with her signature and the date and time. (N.T. 11/15/13 at 47). Upon opening up the evidence bag, she testified that the lab number, item number, and her initials were there. (N.T. 11/15/13 at 47). She testified that she examined the

35

handkerchief, and looked at it under the alternate light source. (N.T. 11/15/13 at 48). She noted that there were some fluorescents around the knotted area. (N.T. 11/15/13 at 48) She further asserted that she cut the knot out, placed it into a clean envelope and prepared it for DNA analysis. (N.T. 11/15/13 at 48). She further agreed that she had access to criminalist Ralph Plankenhorn's report. (N.T. 11/15/13 at 48 - 49).

Mangan next identified several of the Commonwealth's exhibits as her laboratory reports of the analysis of the evidence that she conducted, and noted they have her signature and have a corresponding lab number. (N.T. 11/15/13 at 49). She agreed that she did not test the handkerchief for seminal fluid. (N.T. 11/15/13 at 50). Next, Mangan identified Item 3.1, the fitted bed sheet, which was properly notated with the lab number, the item number, and her initials. (N.T. 11/15/13 at 51). She pointed out that she utilized the alternate light source and marked the area that were fluorescent under the light source. (N.T. 11/15/13 at 51). Further, she noted that she drew arrows to point to where the stains were the most fluorescent so she knew where to cut them. (N.T. 11/15/13 at 51). She asserted that she designated the area that was the top of the sheet based upon the staining that had previously been reported as a blood stain in the area where the victim's head would have been, and based upon the urine stain, where the lower portion of her body would have been. (N.T. 11/15/13 at 52).

Next, Mangan explained that she took cuttings from all of the areas that were fluorescent under the alternate light source for each arrow, and then extracted the cuttings in water for confirmation of sperm or seminal material. (N.T. 11/15/13 at 53 - 54). She further explained that after debris cells are extracted, she places the extract on a slide, and then lets it dry in an oven. (N.T. 11/15/13 at 54 - 55). She further explained that once the extract had died down, she used a stain that stains the nucleus of the cells red and the other cellular materials green. (N.T. 11/15/13 at 55). She noted that the sperm cells are easily detected under a microscope because the cap of the sperm cell does not fully stain red and instead stains a lighter red. (N.T. 11/15/13 at 55). She then asserted that after she stains the slide, she views them under a microscope, and zooms in on a field of view. (N.T. 11/15/13 at 56).

Mangan further explained that she scanned the slide and noted how many sperm heads she was able to see. (N.T. 11/15/14 at 56). She also described a rating system in which she

36

would assign a 1+ to a slide with up to five sperm heads, and explained that 4+ rating indicates the most sperm heads. (N.T. 11/15/13 at 56). She testified that on the fitted bed sheet, there was nothing higher than a 1+ rating, and she further asserted that she sent in for testing two cuttings from the fitted sheet, one containing a blood stain and one containing a urine stain. (N.T. 11/15/13 at 57 - 58).

Mangan further testified that she reviewed that blue bathrobe belonging to the victim in this matter, and examined it under the alternate light source. (N.T. 11/15/13 59). She asserted that she found one sperm head located on the front right side near the belt loop of the blue bathrobe, and gave it a rating of 1+ (N.T. 11/15/13 at 60). She asserted that the area where she found the sperm head was cut and sent for DNA testing. (N.T. 11/15/13 at 60).

Mangan further identified Item 3.2 as the blue flat sheet from the bed. (N.T. 11/15/13 at 61). She asserted that she determined the top of the bed sheet by the fact that the thickest hem was at the top part of it. (N.T. 11/15/13 at 62). She noted that certain areas fluoresced under the alternate light source, and she took cuttings from the area that fluoresced. (N.T. 11/15/13 at 62). She noted that she sent cuttings from areas marked "D" and "H" to be tested for DNA, as she was able to identify sperm in those areas. (N.T. 11/15/13 at 62 – 63). Mangan explained that Area D is from the top right area of the sheet and Area H is from the middle area. (N.T. 11/15/13 at 64). She noted that in area "H," the sperm rating was a 4+. (N.T. 11/15/13 at 69).

Regarding Item 6.1, the six sections of white rope, Mangan noted that when she reviewed it under the alternate light source, the entire rope had a glow to it and certain areas had more of a fluorescence. (N.T. 11/15/13 at 66). Further, she noted that it had discoloration on it. (N.T. 11/15/13 at 66). She testified that she cut some samples from one of the sections and extracted it for sperm, noting that she identified sperm there with a 4+ rating. (N.T. 11/15/13 at 66). She asserted that she cut out that sample and forwarded it to the DNA lab. (N.T. 11/15/13 at 66).

Further, Mangan identified Item 4.1 as the victim's blue nightgown top. N.T. 11/15/13 at 67). She noted that she identified sperm on the middle back portion of the nightgown top. (N.T. 11/15/13 at 67). She explained that she searched for fluorescent areas using the alternate

37

light source, and cut several areas in order to extract for sperm. (N.T. 11/15/13 at 68). She further noted that there was one area where she identified sperm with a rating of 4+, cut the section out, and forwarded it for DNA analysis. (N.T. 11/15/13 at 68). Moreover, Mangan relayed that she received two cups that the Defendant utilized that she swabbed for DNA, and then forwarded the sample for analysis. (N.T. 11/15/13 at 69).

On cross, Mangan admitted that she reviewed the crime scene photos which revealed that the victim had clothes on an ironing board, but she did not receive the clothing for testing. (N.T. 11/15/13 at 75). She agreed that the original reports indicated that in 1979, Ralph Plankenhorn could not find any observable trace evidence. (N.T 11/15/13 at 75 - 76). She further agreed that she retested the rape kit in 2010 and found no sperm in the vaginal or oral swab. (N.T. 11/15/13 at 76).

Mangan agreed that utilizing the alternate light source allowed her to visualize stains. (N.T. 11/15/13 at 77). She further agreed that the only thing she looked for in her examination was sperm, and she explained that she would find the stains first, and then sent them for DNA. (N.T. 11/15/13 at 79 - 80). Regarding the flat bed sheets, she again asserted that once she found a sperm stain, she sent the best stain for DNA analysis. (N.T. 11/15/13 at 82). She also agreed that two of the areas that fluoresced on the blue nightgown top had sperm on them. (N.T. 11/15/13 at 82). She further agreed that with regard to the six areas of the white rope, four contained sperm. (N.T. 11/15/13 at 83).

Mangan further noted that pursuant to Plankenhorn's report, the nightgown top did not retain any observable trace evidence. (N.T. 11/15/13 at 89 – 90). She agreed that she did not observe anything with the naked eye on the back of the nightgown when she reviewed it in 2010. (N.T. 11/15/13 at 90). She further noted that Plankenhorn did not observe any foreign trace evidence on the six pieces of white cord in Item 1, according to his report. (N.T. 11/15/13 at 90). However, she asserted that when she examined the bathrobe cord, there was some beige discoloration on all six pieces of rope. (N.T. 11/15/13 at 90 - 91). She relayed that she also looked at the fitted sheet, and noted blood and urine stains. (N.T. 11/15/13 at 91). She further agreed that neither the fitted nor the flat sheet showed visible signs of semen in 2010.

38

(N.T. 11/15/13 at 92). She also agreed that the DNA testing does not determine when sperm was deposited. (N.T. 11/1/5/13 at 92).

On re - direct, Mangan noted that it was possible based upon her examination of the items that someone could have ejaculated on top of the victim. (N.T. 11/15/13 at 107). She further reiterated that she found sperm on the back of the victim's nightshirt and on the rope. (N.T. 11/15/13 at 107 - 08). She further noted that the flat sheet was found on top of the victim. (N.T. 11/15/13 at 109). She also agreed that it was not significant that Plankenhorn found no visible evidence, as she noted that sometimes semen is not visible with the naked eye. (N.T. 11/15/13 at 111). Regarding the 4+ rating on the top sheet, she noted that it would not have been from a transfer of two dried items packaged together. (N.T. 11/15/13 at 110 – 11). She further noted that the 4+ ratings found in areas on the back of the nightgown, the rope binding her hands, and the top sheet, were significant because they demonstrated that based on the location of the victim, there was a lot of semen located there. (N.T. 11/15/13 at 111). She further agreed that based upon her research and experience, a 4+ rating is not consistent with the items having been washed. (N.T. 11/15/13 at 111 – 12). On re-cross, Mangan agreed that in the immediate case, there were non – visible stains on three items. (N.T. 11/15/13 at 114). She disagreed that those stains were invisible, pointing out that they were simply not visible to the naked eye. (N.T. 11/15/13 at 114).

Next, Angelina Biondi testified on behalf of the Commonwealth. She testified that she is employed by the Commonwealth of Pennsylvania at the Pennsylvania State Police Forensic DNA Division as a forensic DNA scientist supervisor. (N.T. 11/15/13 at 117). She noted that she is competent in DNA analysis and is also a qualified FBI DNA quality assurance auditor, and completed her training at the Pennsylvania State Police DNA Laboratory. (N.T. 11/15/13 at 117 - 18). She pointed out that she has completed graduate level course work from the University of Florida in the area of forensic DNA and serology. (N.T. 11/15/13 at 118). She relayed that she is responsible for DNA analysis of forensic casework samples as well as performing quality assurance and validation procedures, and has been doing so for over ten years. (N.T. 11/15/13 at 118 - 19). She explained that DNA is the "genetic blueprint" of your body, and is a long molecule lightly wound into what we call chromosomes. (N.T. 11/15/13 at 119). She further

39

explained that everyone has 23 pairs of chromosomes, and DNA is unique to all individuals except identical twins. (N.T. 11/15/13 at 119 – 20). She noted that DNA is found within individual cells, including sperm cells. (N.T. 11/15/13 at 120).

Biondi testified that she was involved in the investigation and forensic analysis of the Catherine Janet Walsh case, commencing in 2005. (N.T. 11/15/13 at 120). She noted that the first submission she received in 2005 included a piece of the bandanna and some DNA from the victim. (N.T. 11/15/13 at 121). She relayed that there was no profile obtained from either cutting from the bandanna. (N.T. 11/15/13 at 121). She further noted that she also prepared a lab repot on April 4, 2011, and explained that the purpose of that analysis was to develop a partial profile of the victim and to develop profiles. (N.T. 11/15/13 at 123 – 24). She noted that she received a seminal stain from the middle back area of the nightgown was able to be developed for a profile, and the DNA profile in the sperm fraction at the time was unidentified. (N.T. 11/15/13 at 124, 126 - 27). She also noted that there was a non – sperm fraction in the partial DNA profile obtained. (N.T. 11/15/13 at 127). She further noted that only the victim's DNA was detected from the vaginal swab. (N.T. 11/15/3 at 127). When testing the oral swab, she noted that in the sperm fraction, no results were obtained due to an insufficient quantity of DNA, and in the non – sperm fraction, a partial profile was obtained with the DNA profile matching the hair sample from the victim. (N.T. 11/15/13 at 127 - 28). She further noted that a partial profile was obtained from testing the white rope that matched the unidentified profile from the sperm fraction of a stain from the victim's nightgown. (N.T. 11/15/13 at 128). She noted that the unidentified profile from the rope and from the nightgown was consistent with a male. (N.T. 11/15/13 at 128 - 29). She further explained that the DNA from the nightgown and the rope were determined to be from the same unknown actor. (N.T. 11/15/13 at 129). Biondi further agreed that the samples were thirty (30) years old and had degraded; however, she was still able to pull profiles from the nightgown and the rope. (N.T. 11/15/13 at 130). She explained that degradation would reduce the amount of results she would get from a profile, but would not change the profile. (N. T. 11/15/13 at 131).

Biondi further testified that she received a Buccal collector from the oral cavity of Scott Walsh, and prepared a lab report regarding said swab in 2011. (N.T. 11/15/13 at 131). She

40

noted that she compared Walsh's profile to the profiles she obtained from testing the evidence she received and noted that the DNA profile she received from Scott Walsh did not match any of the profiles she obtained that were interpretable. (N.T. 11/15/13 at 131 – 32).

On cross, Biondi testified that in this case, other than the blue ligature that she received in 2005 and sperm samples, she did not receive anything else to test. (N.T. 11/15/13 at 137). She pointed out that no DNA profile was obtained from testing the bandanna. (N.T. 11/15/13 at 137 - 38). She noted that she began testing other items that she received, such as the piece of the blue nightgown top, the piece of the robe tie, and Buccal swabs from the victim's vaginal and oral areas, in January of 2011. (N.T. 11/15/13 at 138 – 39). She further explained that she received two known standards. (N.T. 11/15/13 at 139). She agreed that no foreign DNA was found from the vaginal or oral swabs of the victim. (N.T. 11/15/13 at 143 - 44). She further noted that DNA cannot be tested to determine when it was deposited. (N.T. 11/15/13 at 144 – 45). She further agreed that she ran a second test for DNA in 2011 regarding a sample from Scott Walsh and noted that his profile did not match anything on the nightgown or robe tie. (N.T. 11/15/13 at 149). On re – direct, Biondi admitted that DNA is not always visible with the naked eye, and sometimes it can't be seen until it is tagged fluorescently. (N.T. 11/15/13 at 152).

Commonwealth expert witness Cyril H. Wecht testified next on behalf of the Commonwealth. He noted that he is a doctor, lawyer and pathologist who is Board certified in forensic pathology. (N.T. 11/15/13 at 154). He asserted that did a year of fellowship from 1961 to 1962, and has practiced full – time pathology since 1962. (N.T. 11/15/13 at 155). He further pointed out that he has been recognized as an expert in Pennsylvania, the United States, and other parts of the world, and further noted that he served as the Coroner of Allegheny County for twenty (20) years in two separate ten (10) year periods, and had been the Chief Forensic Pathologist for four years before that. (N.T. 11/15/13 at 155). He testified that he has performed 357 autopsies so far that year. (N.T. 11/15/13 at 156).

Dr. Wecht explained that a forensic pathologist is a medical doctor who has completed five or six years of training following medical school in pathology. (N.T. 11/15/13 at 158). He stated the following: "[t]he forensic pathologist deals with violent, sudden, suspicious,

41

unexpected, unexplained, medically unattended deaths; known, alleged, suspected homicides, accidents, and suicides." (N.T. 11/15/13 at 159). He noted that in this particular case, he reviewed the autopsy report, the scene photographs, diagrams, sketches and investigative reports, the lab reports from 1979, 2010, 2011, and 2012, and the DNA analyses. (N.T. 11/15/13 at 161 – 62). He testified that he submitted a report dated September 27, 2012, and a supplemental report dated January 15, 2013. (N.T. 11/15/13 at 162). He agreed with the conclusion that the cause of death for Catherine Janet Walsh was strangulation. (N.T. 11/15/13 at 162 – 63). He noted that the ligature marks around the victim's neck were grooves. (N.T. 11/15/13 at 163). He also agreed that there were ligature marks on the left and right wrists of the victim, and noted that the victim's hands were tied by the belt of a robe in a tight position behind her back. (N.T. 11/15/13 at 165). He noted that he believed that her hands were tied behind her back prior to death based upon the cyanotic appearance of her hands. (N.T. 11/15/13 at 166 – 67). He further observed that there were two contusions, one located above the right ear and one located on the victim's left upper cheek. (N.T. 11/15/13 at 167). He also noted that the victim had laryngeal and epiglottic swelling, along with petechial hemorrhages around and within the inner lining of the larynx and the epiglottis. (N.T. 11/15/13 at 171).

Dr. Wecht further relayed that the reports indicated that seminal fluid which matched the Defendant's DNA was found in three locations: the flat sheet, a nightgown top, and the bathrobe belt that was wrapped around the victim's hands. (N.T. 11/15/13 at 173). He further noted that the victim was found face down in a prone position. (N.T. 11/15/13 at 173 – 74). He observed that male ejaculation occurred as the victim was lying down, and some of the ejaculate got onto the three sites. (N.T. 11/15/13 at 174). He stated that based upon the reports he reviewed and his own understanding and knowledge, he had no doubt that the victim was strangled as she lay in bed in a prone and facedown position. (N.T. 11/15/13 at 175 – 76). He further noted: "[i]n order for the ejaculate to be found as it was on the parts of the materials posteriorly, then the ejaculation would have had to have occurred from the individual on top of her...." (N.T. 11/15/13 at 176).

Dr. Wecht further asserted that he reviewed defense expert Dr. Mark Perlin's report. (N.T at 11/15/13 at 176). He noted that he did not agree with Dr. Perlin's assertion that the

lack of fingernail scrapings was significant, noting that one would not get DNA under fingernails unless there was forceful scratching. (N.T. 11/15/13 at 178). Further, he noted that once the victim was immobilized with her hands tied behind her back, there would be no transfer of material beneath her fingernails. (N.T. 11/15/13 at 179). Regarding the suggestions of Dr. Panella and Dr. Perlin that perhaps cross – contamination could have occurred as set forth in their respective reports, Dr. Wecht asserted that he found it to be extremely unlikely that given the location of the Defendant's seminal fluid on the bathrobe tie, overlying sheet and nightgown, the seminal fluid could have been found in those specific locations via contamination due to washing. (N.T. 11/15/13 at 180 – 81). Dr. Wecht described the image of the picture shown to him of the victim and how she was found, noting that her hands are clasped behind her with her buttocks and nightie on top exposed. (N.T. 11/15/13 at 182). He explained that the theories by the other experts don't fit the scenario because of the locations where the Defendant's seminal fluid was found as follows:

> Well, based upon the reports they found some seminal stains described in the mid back area just above the bathrobe belt, so here on this upper nightgown garment, middle area, then on the bathrobe belt, and then on a so – called flat sheet....

(N.T. 11/15/13 at 182). He further explained:

> If these seminal stains had indeed been deposited approximately four weeks before, then you still have a dead body of Miss Walsh. You have her there bound in this exposed position and so on, where is the evidence of the person who would have bound her and done with her whatever it was that he did?

> ∗∗∗∗∗∗∗∗∗∗∗∗

> So, you have a situation that required some involvement by somebody, the tying of the wrists, the tying of the handkerchief around the neck, the positioning of the body, and so on.

> For all of that to have been consummated, to have been executed without evidence of DNA, especially with his evidence of some kind of sexual activity, whether aborted or, but I'm not going to get into that, but the absence is significant, too, and goes along with the positive findings.

(N.T. 11/15/13 at 182 - 85). Dr. Wecht asserted that his opinion was expressed within a reasonable degree of medical forensic scientific certainty. (N.T. 11/15/13 at 183).

On cross, Dr. Wecht set forth that he was aware of the fact that the Defendant had been involved in a sexual relationship with the victim, and noted that the Defendant had stated that he had been with the victim around three to four weeks prior to her death. (N.T. 11/15/13 at 190 – 91). He agreed that the evidence indicated that the Defendant was on the bed on top of the victim's back at or around the time of her death. (N.T. 11/15/13 at 191). He further agreed that the picture of the victim as she was found depicts that the victim was found with her hands behind her back and her fingers up in the air. (N.T. 11/15/13 at 192). He agreed that the investigating officer who checked the nightgown saw no evidence of semen stain on the back of the nightgown in 1979, and also that crime lab originally found no evidence of semen on either the robe tie or the nightgown. (N.T. 11/15/13 at 193 – 94). Dr. Wecht further explained that in 2010, the stains were seen by the crime lab. (N.T. 11/15/13 at 195).

Dr. Wecht further agreed that he had seen Dr. Perlin's report, and noted that Dr. Perlin had found DNA from the Defendant, the victim, and an unknown person on the blue bathrobe. (N.T. 11/15/13 at 200). He further relayed that Dr. Perlin had found some DNA evidence of Scott Walsh, the victim's husband, on the sheets. (N.T. 11/15/13 at 200). He further agreed that there was no evidence found from the victim's oral or vaginal cavity indicating that the Defendant's DNA was present. (N.T. 11/15/13 at 202). Again, Dr. Wecht reiterated that he did not believe that the Defendant's seminal stains would have shown up at the three precise locations where they did if the only means by which they were deposited was contamination. (N.T. 11/15/13 at 215). On re – direct, Dr. Wecht agreed that the nightgown, rope, and flat sheet contained areas with a 4+ sperm rating, which is the most dense rating of seminal fluid.

44

(N.T. 11/15/13 at 217 - 18). He further noted that Dr. Perlin's report attributed the DNA in the three areas with the high density rating to the Defendant. (N.T 11/15/13 at 219).

Laura Brown testified next on behalf of the Commonwealth. She is a forensic DNA scientist with the Commonwealth of Pennsylvania and the Pennsylvania State Police DNA Lab, and has been employed there for three and a half years. (N.T. 11/18/13 at 7). She noted that she has a master of science degree in forensic science and law. (N.T. 11/18/13 at 7). She further relayed that she participated in extensive training from the Pennsylvania State Police Crime Lab in forensic DNA science. (N.T. 11/18/13 at 8). She explained that she completed the training program, and then she participated in a period of time where her casework was supervised. (N.T. 11/18/13 at 8). She noted that she has been qualified as an expert in seven counties in Pennsylvania. (N.T 11/18/13 at 8). She explained that a supervisor assigns cases to a scientist, and the scientist would then remove the evidence from the refrigerator for testing purposes. (N.T. 11/18/13 at 9). She further noted that all movement of evidence is tracked through a bar coded evidence tracking system. (N.T. 11/18/13 at 9). Brown explained that the DNA lab receives samples from different serology sections throughout the Commonwealth, which are then placed into a locked evidence refrigerator after they are received. (N.T. 11/18/13 at 9). She further explained that once she is finished testing the items, they are placed back into the refrigerator through the same process. (N.T. 11/18/13 at 9 – 10). Regarding her duties at the crime lab, Brown asserted that she performs DNA analysis on casework samples following the lab's protocol and quantity assurance guidelines, and writes reports based upon her findings. (N.T 11/18/13 at 10). She further noted that she is qualified in technical review. (N.T. 11/18/13 at 10). She explained that she performs STR or short tandem repeat testing, which is a process in which the scientist looks at 16 different areas of the DNA molecule and measures the lengths of those areas. (N.T. 11/1813 at 10 – 11). She relayed that she is able to develop a DNA profile by combining the results of the lengths of these areas, and after a DNA profile is achieved, that profile can be compared to individuals. (N.T. 11/18/13 at 11).

Brown agreed that she had been involved in the immediate case commencing on August 24, 2011. (N.T. 11/18/13 at 11 - 12). Brown further agreed that Angela Biondi performed

casework analysis prior to her own involvement in the matter. (N.T. 11/18/13 at 12). She stated that she received Item Q8, a cutting from a seminal stain from the top middle area of the fitted sheet from the victim, Item Q9, a seminal stain from the right middle area of the fitted sheet from the victim, and a known standard sample labeled K5, which was a Buccal collector from Ronald Ciccozzi. (N.T. 11/18/13 at 13). Brown asserted that her testing revealed that the non-sperm fraction of the seminal stain from the top middle area of the sheet matched the head hair sample from the victim. (N.T. 11/18/13 at 13). She stated that she was not able to obtain any other results from the fitted sheet due to insufficient DNA and sample degradation. (N.T. 11/18/13 at 14). She noted that she was not able to find any matches to Ron Ciccozzi on any evidence that she tested. (N.T. 11/18/13 at 15 - 16). After reviewing Angeina Biondi's case files, she noted that she was unable to match Ron Ciccozzi's DNA profile to the sperm and non – sperm fractions of the stain from the nightgown top, the partial DNA profile obtained from the sperm and non – sperm fractions of the vaginal swabs, the partial DNA profile obtained from the non – sperm fraction of the oral swabs, or the partial DNA profile obtained from the sperm fraction of the stain from the rope. (N.T. 11/18/13 at 16). She further pointed out that she did not obtain results from the handkerchief. (N.T. 11/18/13 at 16 - 17). She further agreed that she performed Y chromosome testing on the flat sheet to determine if male DNA was present, and noted that there was not a sufficient amount of Y chromosome DNA present to obtain results. (N.T. 11/18/13 at 17 – 18). She further agreed that she was unable to obtain results from the fingernail clippings of the victim, as there was not a sufficient quantity of DNA present. (N.T. 11/18/13 at 18). Regarding the DNA on the cup rims utilized by the Defendant, she noted that she determined after testing that the Defendant could not be eliminated as an investigative lead. (N.T. 11/18/13 at 19).

Next, Brown testified that she received Item K7, a Bode Buccal collector from the Defendant, which was a known standard. (N.T. 11/18/13 at 20). She testified that she compared the Defendant's known standard with Q1 through Q8 and Q9, and found matches. (N.T. 11/18/13 at 20). She testified that the DNA profile from the known sample from the Defendant matched the DNA profile obtained from the sperm and non – sperm fractions from the victim's nightie, or item Q3M. (N.T. 11/18/13 at 20). Furthermore, she stated that the

Defendant's DNA profile matched the DNA profile obtained from the sperm fraction of the stain from the rope tie, or Item Q6M. (N.T. 11/18/13 at 21). She further agreed that the vaginal and oral swabs did not match the Defendant, and also agreed that she was unable to obtain results from areas of the handkerchief or areas of the fitted sheet. (N.T. 11/18/13 at 21).

Brown further explained that she tested the items set forth in Laboratory Report -13, or Commonwealth's Exhibit 62, which referenced Item Q7, the knot from the handkerchief, Item Q10, a seminal stain from the top right side of the blue flat sheet, Item Q11, the seminal stain from the middle area of the blue bed sheet, and Item K9, a DNA and saliva collection card from Robert McGrail. (N.T. 11/18/13 at 21 - 22). She asserted that she found no interpretable results from the knot from the handkerchief, or Item Q7. (N.T. 11/18/13 at 22). However, she noted that she was able to obtain a partial DNA profile from the sperm fraction of the seminal stain from the middle area of the sheet, or Item Q11M, and further noted that the partial profile matched the DNA profile obtained from the Defendant. (N.T. 11/18/13 at 23). She further pointed out the profile obtained from the non – sperm fraction matched the DNA profile of the Defendant. (N.T. 11/18/13 at 23 – 24). Moreover, she noted that the DNA profile of Robert McGrail did not match any of the profiles that were tested. (N.T. 11/18/13 at 23 – 24). Further, Brown identified Lab Report -15, or Commonwealth's Exhibit 63, which referenced Items Q14 through Q18, which were various cuttings from the victim's blue bathrobe, and also Item K9, a Buccal collector from Victor Ciccozzi. (N.T. 11/18/13 at 24). She noted that the only result obtained from those items was a non – sperm fraction of the inner layer of the left front opening of the blue bathrobe, and that partial DNA profile matched the head hair sample from the victim. (N.T. 11/18/13 at 25). She also pointed out that the Victor Ciccozzi profile did not match any DNA found on the nightgown, rope or bed sheets. (N.T. 11/18/13 at 25). She further noted that she performed a Y chromosome test, but observed that no results were found on those items utilizing that test due to an insufficient amount of DNA. (N.T. 11/18/13 at 25). She further explained that degradation does not change the DNA that is found, it merely changes the areas of DNA that can be used to compare to an individual. (N.T. 11/18/13 at 26). She further pointed out that there was not any unknown DNA that she found that did not match either the Defendant or the victim. (N.T. 11/18/13 at 26). She further

asserted that her conclusions were reached to a reasonable degree of certainty in her field. (N.T. 11/18/13 at 26).

On cross, Brown noted that she did not become involved in the case until August 9, 2011. (N.T. 11/18/13 at 27). She agreed that the only DNA she could find on the fitted sheet was DNA belonging to the victim. (N.T 11/18/13 at 30). She further agreed that the standard submitted from Ronald Ciccozzi did not match the profiles from the robe tie or the nightgown. (N.T. 11/18/13 at 30). Regarding her report from October 3, 2011, Brown asserted that at that time, she examined two seminal stains from the fitted sheets, or Items Q8 and Q9, and then a standard Buccal collector from Ronald Ciccozzi, or Item K5. (N.T. 11/18/13 at 31).

Brown further testified that ultimately, she found a profile that matched the Defendant from the back of the nightgown and the robe tie. (N.T. 11/18/13 at 31 – 32). She agreed that there is no way for the machines that she utilizes to determine when the DNA was deposited. (N.T. 11/18/13 at 32 – 33). She further agreed that she did not find any foreign DNA from the fingernail clippings from the victim. (N.T. 11/181/13 at 33). She further explained that in accordance with her report dated January 6, 2012, she received a Buccal swab from the Defendant, and was able to match the Defendant's profile to the profile found at the back of the nightgown and the robe tie. (N.T. 11/18/13 at 38 - 39). However, she agreed that she could not tell how or when the DNA was deposited. (N.T. 11/18/13 at 40). Regarding the ratings for the items, she testified that Item Q3, the stain from the nightgown, and also the stain from the white rope, were both rated 4+. (N.T. 11/18/13 at 41). She further explained that the serologist who had the rope would have cut three pieces and sent them for DNA, and noted that she received two samples from the rope herself. (N.T. 11/18/13 at 43).

Again, Brown confirmed that the DNA profile obtained from the known sample from the Defendant did not match the partial DNA profile obtained from the sperm and non - sperm fractions of the vaginal swab and non – sperm fraction of the oral swab from the victim, and the non – sperm fraction of the seminal stain from the top middle area of the sheet. (N.T. 11/18/13 at 43 - 44). She also agreed that the profile from the Defendant did not match the following items of evidence: the cutting from the larger of the two ends of the handkerchief; the sperm fraction of the oral swab from the victim; the sperm fraction of the seminal stain from the top

48

middle area of the sheet; the sperm fraction of the seminal stain from the right middle area of the sheet; the sperm and non – sperm fractions of the seminal stain from the right middle area of the sheet, and the left and right hand clippings from the victim. (N.T. 11/18/13 at 45 – 46). She explained that there was not enough DNA in those areas for any matches to be made. (N.T. 11/18/13 at 46). Regarding her report dated January 5, 2012, Brown noted that she was able to match the Defendant's profile to the middle area of the flat sheet. (N.T. 11/18/13 at 48). She further reiterated that there were no interpretable findings from the knot or the two ends of the handkerchief. (N.T. 11/18/13 at 48 - 49).

On re – direct, Brown asserted that sperm is most of the time a richer source of DNA than touch DNA. (N.T. 11/18/13 at 59). She further agreed that the "Y" chromosome testing did not reveal any "Y" chromosomes on the robe. (N.T. 11/18/13 at 61). On further re – direct, Brown admitted that she could not rule out sexual activity based on the fact that there were no matches from the oral and vaginal swabs. (N.T. 11/18/13 at 64).

Richard Neff testified on behalf of the defense. Neff asserted that he has lived in Florida for the last six years, but noted that he lived in Moon Township, Pennsylvania prior to that and still has a house there. (N.T. 11/18/14 at 89 - 90). He testified that he is a semi – retired attorney and maintains an office in Robinson Township, PA. (N.T. 11/18/13 at 90). He further noted that he also was the part owner of Service Link, a title insurance vendor management company, until it was sold in 2007. (N.T. 11/18/13 at 91). He stated that he met the Defendant through the Defendant's ex – wife, Dianne, who was the assistant manager of the Peoples Home Savings and Loan in Hopewell. (N.T. 11/18/13 at 91 – 92). He noted that he knew the Defendant socially and then professionally, after he found out that the Defendant was a realtor, and attended realtor meetings with him. (N.T. 11/18/13 at 93). Further, he noted that the Defendant built his office fifteen (15) to nineteen (19) years ago. (N.T. 11/18/13 at 93). He noted that he has gone on vacations with the Defendant, and has been out to dinner with the Defendant many times. (N.T. 11/18/13 at 94). Moreover, he asserted that prior to moving to Florida, he would socialize with the Defendant on a monthly basis. (N.T. 11/18/13 at 94). Neff asserted that he came into contact with fellow realtors, lenders, title insurance agents, and also was part of a social circle of people who knew the Defendant. (N.T. 11/18/13 at 94 - 95). He

testified that over the years, he had the occasion to speak to those individuals about the Defendant's reputation for being a truthful individual. (N.T. 11/18/13 at 95). He noted that amongst the realtors in Beaver County, the Defendant had an excellent reputation for truthfulness and honesty, and for being a law abiding citizen. (N.T. 11/18/13 at 95). Furthermore, Neff relayed that the Defendant had a reputation for being a non – violent person. (N.T. 11/18/13 at 96 – 97).

On cross, Neff admitted that he had been living in Florida for the last few years. (N.T. 11/18/13 at 97). He agreed that he was the Defendant's attorney for a period of time. (N.T. 11/18/13 at 99). Neff admitted that he was not aware of the fact that when he met the Defendant, the Defendant was having secret relationships outside of marriage. (N.T. 11/18/13 at 104 - 05). Neff admitted that he was aware of the fact that the Defendant had gone through a bankruptcy with Colony Square. (N.T. 11/18/13 at 106). However, he denied knowledge of the Defendant hiding assets during the bankruptcy. (N.T. 11/18/13 at 106).

Larry Musgrave testified on behalf of the defense. He asserted that he is sixty – four (64) years old and lives in Economy Borough, Pennsylvania; he is employed by Verizon as a service tech. (N.T. 11/18/13 at 113 - 14). He asserted that he has been married to Georgeann for forty – four (44) years. (N.T. 11/18/13 at 114). He noted that he used to work for Colony Square Builders and had first met the Defendant when they were both volunteer fireman in Economy Borough. (N.T. 11/18/13 at 115 – 16). He stated that in 1974 or 1975, the Defendant started building homes through Stylex Homes and was married to Ella Hopkins. (N.T. 11/18/13 at 117). He asserted that he and his wife would socialize and go on vacations with the Defendant and his wife. (N.T. 11/18/13 at 117). Musgrave noted that the Defendant offered him a position with his company, and took the position in 1975 or 1976 and ran the office. (N.T. 11/18/13 at 118). He testified that the Defendant worked in the field and did hands – on construction. (N.T. 11/18/13 at 118). He noted that he worked there until 1980. (N.T. 11/18/13 at 118). He asserted that the Defendant and his wife separated in 1978 or 1979. (N.T. 11/18/13 at 118 – 19). He stated that the office was located right off of the Center exit at 186 Pleasant Drive in the basement of the model home with a two – car garage on the side. (N.T. 11/18/13 at 119 - 20). He asserted that Colony Square Builders built modular homes.

(N.T. 11/18/13 at 120). He noted that when you opened the door of the model home, there were six steps taking you down to the basement and six steps taking you up to the first floor. (N.T. 11/18/13 at 121). Regarding his official title, he noted that the Defendant had made him the secretary/treasurer of the company, and the Defendant was the President. (N.T. 11/18/13 at 123). He explained that the offices are in the downstairs of the building, and there was sliding glass door for entrance to the office. (N.T. 11/18/13 at 124).

Regarding the inside of the house, he noted that one would enter into the landing, come up the set of steps, go across the top corner of the living room and straight into the kitchen/dining room, or go back the hallway to the three bedrooms. (N.T. 11/18/13 at 125). He asserted that Margie Farinacci cleaned the house for them. (N.T. 11/18/13 at 126). He noted that when the Defendant was going through his separation, he put bedroom furniture in the back bedroom. (N.T. 11/18/13 at 126). He explained that the only way out of the house was either to go down the steps out the front door or to go down the first set of steps to the landing and then down the second set of steps through the basement and then either out through a door to the garage and then through the garage door or out the sliding glass door. (N.T. 11/18/13 at 129 - 30).

Regarding August 31, 1979, he testified that on that date from 6:00 p.m. until 8:00 p.m., he went waterskiing with the Defendant and other people from work. (N.T. 11/18/13 at 136). He stated that they were planning on having a pig roast the next day at the model home for the employees. (N.T. 11/18/13 at 137). He explained that his wife and he planned on spending the night at the model home because they would have to get up early the next morning to put the pig on the spit. (N.T. 11/18/13 at 137 - 38). He explained that they slept on the living room floor of the model home that night. (N.T. 11/18/13 at 139). He noted that his wife came over to the model home at around 8:30 that evening. (N.T. 11/18/13 at 139). He noted that he arrived at the model home at around 8:00 or 8:30 that evening. (N.T. 11/18/13 at 139). He asserted that the Defendant was driving his truck that night. (N.T. 11/18/13 at 140). He asserted that Georgeann, his wife, and Dianne St. George, the Defendant's girlfriend at the time, met them at the model home. (N.T. 11/18/13 at 140). He also noted that Don Young and his wife were there that evening as well. (N.T. 11/18/13 at 140 - 41). He testified that they

51

made potato salad and got different foods ready for the next day. (N.T. 11/18/13 at 141). He noted that Don Young and his wife left, and at around 12:00 or 1:00 a.m. the remaining individuals started getting ready for bed. (N.T. 11/18/13 at 142 – 43). He stated that they planned on getting up at 5:30 or 6:00 in the morning and slept on the living room floor. (N.T. 11/18/13 at 144). He further asserted that Dianne slept in the back bedroom in the waterbed with the Defendant. (N.T. 11/14/13 at 144). He relayed that they got up at 5:30 or 6:00 a.m. (N.T. 11/18/13 at 147). He explained that in order for the Defendant to leave the house, he would have had to come down the hallway, across the top of the living room, go down the stairs and out the front door or down the second set of steps and either out through the garage or out through the sliding glass doors in the back office. (N.T. 11/18/13 at 148). He stated that he did not remember the phone ringing and did not wake up due to the sound of someone coming or going. (N.T. 11/18/13 at 148). He noted that it would have been a maximum of six (6) feet from where they were sleeping and the top of the steps. (N.T. 11/18/13 at 149). He further noted that the driveway was limestone and one could hear a vehicle driving on it. (N.T. 11/18/13 at 149). He denied hearing any vehicle on limestone that night. (N.T. 11/18/13 at 149). Also, he denied hearing the garage door go up. (N.T. 11/18/13 at 149). He also stated that he did not hear anybody go out or come into the residence. (N.T. 11/18/13 at 150). He asserted that the next morning, the Defendant appeared normal and was in the house when he got up at 5:30 or 6:00 a.m. (N.T. 11/14/13 at 150). He testified that after they got up, the first thing they did was get the fire started, and then put the pig on the spit. (N.T. 11/18/13 at 151). He noted that they worked together on keeping the fire going and rotating the pig on the spit. (N.T. 11/18/13 at 152). He relayed that they were expecting twenty (20) people to attend the picnic. (N.T. 11/18/13 at 152).

Larry Musgrave indicated that the pig roast went fine that day, and relayed that the Defendant was there throughout the afternoon and acted normally. (N.T. 11/18/13 at 154). He noted that at some point that day the Defendant came to him and told him that he had to go to the police station because Janet Walsh had been killed. (N.T. 11/18/13 at 154). Musgrave asserted that he knew the victim because she was a friend of Margie Farinacci, and he noted that sometimes Margie would bring Janet to the house when she was cleaning it. (N.T.

52

11/18/13 at 154 - 55). He noted that he learned later on that the Defendant was seeing the victim. (N.T. 11/18/13 at 155). He pointed out that the Defendant left to talk to the police and came back. (N.T. 11/18/13 at 155). Musgrave testified that the police interviewed him around five or six days later at the office in Center Township. (N.T. 11/18/13 at 156). He agreed that he told the police basically the same account of the events as he was testifying to. (N.T. 11/18/13 at 156). He noted that the police report dated September 6, 1979 sets forth that he told the police he had gotten up at 5:30 that morning. (N.T. 11/18/13 at 157). He noted that after he told the Defendant that he had talked to the police, the Defendant did not seem concerned. (N.T. 11/18/13 at 158). He explained that he worked for Colony Square Builders until 1980 due to the economic slowdown. (N.T. 11/18/13 at 158). At that point, he went to work for Taylor Milk until 1997. (N.T. 11/18/13 at 158). He noted that he and the Defendant still own apartments together. (N.T. 11/18/13 at 159). He agreed that the police re – interviewed him a few years later, and he told them the same account. (N.T. 11/18/13 at 159 – 60). He noted that in 2011, he and his wife went to the State Police Barracks and did interviews and gave written statements. (N.T. 11/18/13 at 161). He identified the statement dated November 2, 2011. (N.T. 11/18/13 at 161). He also asserted that the night the police arrested the Defendant, two officers knocked on his door, asked to come in, and asked them if they would like to change their story. (N.T. 11/18/13 at 162 – 63). He asserted that he insisted that the Defendant could not have committed the act because he was with him at the model home. (N.T. 11/18/13 at 164). He further asserted that his version of the events has not changed at any time. (N.T. 11/18/13 at 165). He noted that the police asked again to speak with them, and they refused. (N.T. 11/18/13 at 165 – 66). He noted that Lou Scarsella had approached him at a car cruise, informed him that he had been replacing the kitchen for the victim's parents, and had asked him what he knew about the case. (N.T. 11/18/13 at 167 - 68). He relayed that he told Scarsella that Scarsella himself also knew what happened because he also had attended the picnic. (NT. 11/18/13 at 168). He noted that later he called Scarsella to find out the names of other individuals who attended the pig roast for the investigation team. (N.T. 11/18/13 at 169).

Musgrave admitted that the Defendant had called him within an hour or two of his arrest. (N.T. 11/18/13 at 174). He further noted that he and the Defendant own seventeen (17) apartments together. (N.T. 11/18/13 at 180). He asserted that he was not aware of the fact that in 1979, the Defendant had told the police that the Defendant, Larry Musgrave, the victim, and Margie Farinacci would go to builders' meetings on Wednesday nights at the Holiday Inn in Beaver Falls. (N.T. 11/18/13 at 185). He explained that he and the Defendant would go to the builders' meetings, and then sometimes Margie Farinacci would show up for a drink after the meeting. (N.T. 11/18/13 at 185 - 86). He denied knowing that the Defendant was seeing the victim at the time. (N.T. 11/18/13 at 189). He explained that there were no phones in the upstairs of the model home; the phone was downstairs. (N.T. 11/18/13 at 191). He agreed that he was re-interviewed by the police on April 18, 1981. (N.T. 11/18/13 at 194). When asked why the report does not mention that he stated he didn't sleep well on the night in question, he replied that the officers probably did not ask him how he slept. (N.T. 11/18/13 at 195 – 96). Further, he agreed that during the January 29, 2012 interview, he asserted that it may not have been impossible, but would have been impracticable for the Defendant to have left the house. (N.T. 11/18/13 at 201). He again reiterated that he did not know that the Defendant had been seeing Janet Walsh until after the Defendant had talked to the police on September 1, 1979. (N.T. 11/18/13 at 214). Musgrave explained that he had seen the victim at the office when Margie Farinacci was cleaning the office. (N.T. 11/18/13 at 214).

On re – direct, Larry Musgrave explained that on January 29, 2012, he had told the police it was not impossible for the Defendant to have left the house, but explained that it would have been very impractical because he would have had to jump down twelve (12) or thirteen (13) feet. (N.T. 11/18/13 at 216). He again reiterated that on September 1, 1979, he has gotten up at 5:30 a.m. (N.T. 11/18/13 at 217).

Margaret Rutkauskas testified next for the defense. She stated that she is fifty – two (52) years old, has a home in Imperial, Pennsylvania, and resides in Carnegie, Pennsylvania to care for her mother; she works for USAirways as a flight attendant. (N.T. 11/18/13 at 226 – 27). She asserted that the Defendant built her home in Imperial Point in 1997 and 1998. (N.T. 11/18/13 at 227 - 28). She explained that based upon her discussions with others in the real

54

estate and building community, the Defendant had a reputation for being an honest and trustworthy builder in 1997 and 1998. (N.T. 11/18/13 at 231 - 32). She noted that the Defendant built her house, and further asserted that she is still residing there. (N.T. 11/18/13 at 232). On cross, Rutkauskas explained that the name of the Defendant's company was GS Hopkins, Inc. (N.T. 11/18/13 at 232). She was not aware of the fact that the Defendant had declared bankruptcy and had taken some of the items and hid them in another location. (N.T. 11/18/13 at 232 – 33). She agreed that she did not know anything about the Defendant in 1979, and knew nothing about his personal life. (N.T. 11/18/13 at 233 - 34).

Georgeann Musgrave testified next on behalf of the Defendant. (N.T. 11/18/13 at 234). She stated that she is sixty – three (63) and is married to Larry Musgrave. (N.T. 11/18/13 at 235). She testified that she met the Defendnat through her husband, as they were volunteer fireman in Economy Borough together. (N.T. 11/18/13 at 235). She noted that they socialized together and their children played together. (N.T. 11/18/13 at 236). She asserted that in August and Spetember of 1979, her husband was employed by the Defendant at Colony Square Builders. (N.T. 11/18/13 at 236). She explained that at that time, she was employed as the head teller at First Seneca Bank in Rochester. (N.T. 11/18/13 at 236). She noted that the model home in question was located on Pleasant Drive in Center Township, and relayed that on August 31, 1979, she arrived there between 9:00 and 9:30 after work. (N.T. 11/8/13 at 238). She asserted that when she arrived, Dianne St. George and the Defendant were there, and they prepared for the picnic the next day. (N.T. 11/18/13 at 239 - 40). She asserted that the driveway was gravel. (N.T. 11/18/13 at 240). She noted that there were no steps off of the back of the deck attached to the house, and the living room had steps leading down. (N.T. 11/18/13 at 240). She noted that on the night in question, the windows were open. (N.T. 11/18/13 at 240 – 41). She testified that they would have gone to bed at 1:00 a.m. or later. (N.T. 11/18/13 at 241). She noted that throughout the night she did not hear anyone use the stairs or the gravel driveway; she also did not hear the telephone ring or anyone talking on the phone. (N.T. 11/18/13 at 241, 247). She asserted that when she got up the next morning, the Defendant, her husband, and Dianne St. Geroge were there, and the Defendant and her husband were preparing the pig and then turning the spit. (N.T. 11/18/13 at 242). She relayed

55

that the picnic was supposed to start at noon that day. (N.T. 11/18/13 at 242). She noted that the Defendant acted normally for the rest of the day. (N.T. 11/18/13 at 243). She pointed out that the police first spoke with her about the incident in 2011, and further noted that she gave a written statement. (N.T. 11/18/13 at 243 - 44). She further asserted that the night the Defendant was arrested, the police came to their home and asked her husband if he wanted to change his story. (N.T. 11/18/13 at 245 - 46). On cross, she agreed that on the night in question, she slept in the living room with her husband from some point after midnight until 5:30 or 6:00 a.m. (N.T. 11/18/13 at 248). She denied being aware of the fact that the Defendant had told the police that her husband had been meeting Margie Farinacci out for drinks on Wednesday nights after builders' meetings. (N.T. 11/18/13 at 249).

Detective Andrew Gall was recalled to the stand. He stated that on September 7, 1979, Wanda Jesky found Robert McGrail's checkbook, and turned it into Sergeant Tyler of the Monaca Police Department. (N.T. 11/18/13 at 263). He noted that it was found on Ninth Street in a gutter, approximately thirty (30) feet from Indiana Avenue in Monaca. (N.T. 11/18/13 at 265 - 66). On re – direct, he noted that the checkbook was found within a block from 935 Indiana Avenue. (N.T. 11/18/13 at 269).

Samuel Johns testified next on behalf of the Defendant. He testified that he resides at Cliff Lane, Vanport, Pennsylvania. (N.T. 11/19/13 at 10). He noted that he is retired from the Center Township Police Department. (N.T. 11/19/13 at 10). He asserted that in 1979, he was working as a part – time patrolman for Center Township. (N.T. 11/19/13 at 10 – 11). He recalled being at the Getaway Lounge in Center Township on the night before the incident. (N.T. 11/19/13 at 11). He noted that he was introduced to Janet Walsh that evening. (N.T. 11/19/13 at 11). He observed that Janet Walsh was dancing, talking to people, and drinking. (N.T. 11/19/13 at 13).

Dr. Michael Panella testified next on behalf of the Defendant. He testified that he is a staff pathologist with Quest Diagnostics. (N.T. 11/19/13 at 17). He noted that he is an M.D. and a J.D. and is Board Certified in anatomical clinical pathology and forensic pathology. (N.T. 11/19/13 at 17 – 18). He testified that he has worked as a pathologist at several hospitals. (N.T. 11/19/13 at 18). He worked as a forensic pathologist at the Allegheny County Medical

Examiner's office and then worked in private practice. (N.T. 11/19/13 at 20). He relayed that he has performed approximately 1,500 autopsies. (N.T. 11/19/13 at 22). He noted that he reviewed the reports, opinion letters and laboratory notes involved in this case. (N.T. 11/19/13 at 27 – 28). He opined that the semen found by the crime lab which matched the Defendant's DNA could have been deposited there during previous sexual encounters with the Defendant and the victim. (N.T. 11/19/13 at 37 – 38). He also noted that there could have been indirect contact; there could have been previous recent deposits on bedding or clothing that came into contact with the robe tie or nightgown top, or there could have been fresh semen deposits on the hands or body of either the victim or the Defendant which could have come into contact with the sites where the semen was found. (N.T. 11/19/13 at 38 - 39). Further, he noted that during laundering, the semen could have lifted off contaminated garments and been re - deposited onto other garments. (N.T. 11/19/13 at 39). Also, he asserted that there could have been cross – contamination during the investigation. (N.T. 11/19/13 at 39 – 40). Further, he pointed out that there was no foreign DNA found in the vaginal or oral swab. (N.T. 11/19/13 at 67 – 68). He testified that to a reasonable degree of medical certainty, it was possible, but not probable, that the Defendant was on top of or close to the victim at the time of her death. (N.T. 11/19/13 at 68 – 69).

Dianne St. George testified next on behalf of the defense. She stated that she is sixty – four (64) and resides in Florida, but used to reside in Beaver County. (N.T. 11/19/13 at 128). She asserted that she met the Defendant in 1978 while both he and she were married to other people. (N.T. 11/19/13 at 130). Eventually, they both separated from their spouses and later married in 1983. (N.T. 11/19/13 at 130 - 31). She stated that the Defendant resided in the model home on Pleasant Drive in Center Township, Pennsylvania after he separated from his first wife. (N.T. 11/19/13 at 131). She agreed that there were nights when they slept in the back bedroom of the model home on the waterbed. (N. T. 11/19/13 at 131). She noted that in 1979, she was working at the People's Building and Loan in Hopewell and Beaver. (N.T. 11/19/13 at 132 - 33). She asserted that the Defendant was a builder and contractor. (N.T. 11/19/13 at 133).

Regarding Labor Day weekend in 1979, Ms. St. George asserted that the Defendant had a pig roast for his employees and friends. (N.T. 11/19/13 at 133). She asserted that she arrived at the model home at around 9:30 p.m. on Friday, August 31, 1979. (N.T. 11/19/13 at 134). She noted that Larry and Georgeann Musgrave and the Defendant were there. (N.T. 11/19/13 at 134). She remembers generally preparing food. (N.T. 11/19/13 at 134 – 35). She noted that she and the Defendant slept in the waterbed and the Musgrave slept in the living room. (N.T. 11/19/13 at 135). She testified that she did not remember waking up in the middle of the night and did not remember the bed moving at all. (N.T. 11/19/13 at 135 – 36). She asserted that the phone did not ring during the night. (N.T. 11/19/13 at 136). She testified that the next morning, the Defendant and Larry Musgrave worked building the fire and attending to the pig while she and Georgeann Musgrave were doing things inside. (N.T. 11/19/13 at 136 - 37). She set forth that the pig roast went off as planned, and the Defendant acted normally. (N.T. 11/19/13 at 137). She observed that later that day, he sat down with her and told her that someone he had been seeing had been murdered. (N.T. 11/19/13 at 137). She testified that he admitted to having a sexual relationship with her; she was surprised by this fact. (N.T. 11/19/13 at 137 – 38). She noted they were married from 1983 until 1999. (N.T. 11/19/13 at 138). She agreed that she was contacted by Detective Gall in November of 2011, and she told him that she had been with the Defendant the night in question (N.T. 11/19/13 at 139 – 40). She further pointed out that she talked to the Winter Park police in July of 2012; she told them she had spent that night with Scott Hopkins. (N.T. 11/19/13 at 140). She asserted that she also told the police last week the same thing. (N.T. 11/19/13 at 140 – 41). She admitted that she owned properties with the Defendant and the Musgraves. (N.T. 11/19/13 at 142).

On cross, Ms. St. George testified that she owns three or four properties with the Defendant. (N.T. 11/19/13 at 143). She agreed that the Defendant started seeing Margaret Lehocky toward the end of their marriage. (N.T. 11/19/13 at 145). She testified that prior to September 1, 1979, she was not aware of the fact that the Defendant was seeing Janet Walsh. (N.T. 11/19/13 at 149). She reiterated that when she had gotten up the morning of September 1, 1979, the Defendant was already up. (N.T. 11/19/13 at 162).

58

The Defendant testified next in his own defense. He stated that he is sixty – seven (67) and resides at 718 Mulberry Street in Bridgewater, Pennsylvania. (N.T. 11/19/13 at 164). He asserted that he was first married in 1967 to Ellen Hopkins, and they lived in Economy Borough. (N.T. 11/19/13 at 165). He noted that he joined the fire department in Economy in the 1970's, where he met Larry Musgrave. (N.T. 11/19/13 at 169 - 70). He stated that he started Colony Square Builders in the 1970's. (N.T. 11/19/13 at 171). He admitted to cheating on his wife in the late 1970's with Dianne St. George, whom he met at a real estate function. (N.T. 11/19/13 at 171 – 72). He explained that around that time, Larry Musgrave began working for him. (N.T. 11/19/13 at 172). He noted that Colony Square Builders had six to eight employees and a number of subcontractors. (N.T. 11/19/18 at 172). He noted that at this time, he would stay with his parents or the model home, which he described as a split entry. (N.T. 11/19/13 at 173 – 74). He explained that Larry Musgrave tracked the orders and made the drawings, while the Defendant worked in the field. (N.T. 11/19/13 at 175). He noted that after he was living at the model home, he was dating Dianne St. Goeorge. (N. T. 11/19/13 at 175). He explained that he had a waterbed in the model home. (N.T. 11/19/13 at 176). He noted that he met Margie Farinacci when his company built the house for her and her husband; she then worked for the company cleaning houses. (N.T. 11/19/13 at 176 – 77). He explained that his company had built what ended up being Janet and Scott Walsh's house on the same street as Margie Farinacci's house. (N.T. 11/19/13 at 177 – 78). He further pointed out that sometimes Janet Walsh would come to the job site where Margie Farinacci was cleaning, as she and Margie Farinacci were friends. (N.T. 11/19/13 at 178). He further asserted that he and Janet Walsh engaged in a sexual relationship. (N.T. 11/19/13 at 178 – 80). He testified that she had invited him to her apartment and he went over there on several occasion in the summer of 1979. (N.T. 11/19/13 at 179). He stated that she would call him while he was sleeping at the office, and he would go over to her apartment at around 10:00 p.m., or as late as 11:30 p.m. (N.T. 11/19/13 at 179 – 80). He denied having a social relationship with her, except he noted that on one or two occasions, she and Margie Farinacci had drinks with them after the builders' meetings, which were held once a month at the Holiday Inn in Beaver Falls. (N.T. 11/19/13 at 180, 184). He attended the meetings with Larry Musgrave. (N.T. 11/19/13 at 184). He stated that she had

59

told him that her husband was jealous, so when he went to visit her, he would park on Atlantic Avenue. (N.T. 11/19/13 at 181). He noted that he would enter through the backdoor of the house. (N.T. 11/19/13 at 181). He explained that the meetings at the house lasted two or three hours at the most. (N.T. 11/19/13 at 182). He stated that he would go back to his office at around 1:00 or 2:00. (N.T. 11/19/13 at 182). He relayed that he did not tell Dianne St. George about his relationship with the victim until September 1, 1979. (N.T. 11/19/13 at 183). He noted that he didn't tell anyone about their relationship while it was going on. (N.T. 11/19/13 at 183).

He testified that on Friday, August 31, 1979, he took the pig that was going to be eaten at the pig roast back to the office. (N.T. 11/19/13 at 187). He stated that he and a group of people, including Larry Musgrave, went waterskiing until about 8:00 that evening. (N.T. 11/19/13 at 187 - 88). He asserted that Don Young and his wife were at the model home helping to prepare for the pig roast; they left at around 11:00 or 12:00 that evening and came back the next day. (N.T. 11/19/13 at 187 – 88). He noted that Larry Musgrave was there that evening, and later, Larry's wife and the Defendant's girlfriend came to the model home after they left work. (N.T. 11/19/13 at 188). He noted that his girlfriend and the Musgraves stayed the night to prepare for the pig roast. (N.T. 11/19/13 at 188 – 89). The Defendant stated that he went to bed at 12:00 a.m. or 1:00 a.m. (N.T. 11/19/13 at 180).

He noted that a week or a week and a half earlier, he had called the victim to see if she wanted him to come down that night, and she told him that she was already asleep. (N.T. 11/19/13 at 189 – 90). He asserted that prior to that, he had seen her several weeks before. (N.T. 11/19/13 at 190). He denied that he had received a phone call from her that night, and further denied knowing where she was at that time. (N.T. 11/19/13 at 190). He relayed that on that night, he slept in the waterbed in the back bedroom with his girlfriend Dianne. (N.T. 11/19/13 at 190). He asserted that the Musgraves slept on the floor in the living room. (N.T. 11/19/13 at 191 – 92). He noted that the next morning, he got up at 5:30 or 6:00 a.m. (N.T. 11/19/13 at 191). He denied leaving the house that morning. (N.T. 11/19/13 at 191). He stated that the next morning, they got the pig ready and started the fire; they then put the pig on the spit and started cooking it. (N.T. 11/19/13 at 191 – 92). He asserted that sometime that

afternoon, he got a call form Joe Farinacci, Margie's husband, who told him that Margie had a personal problem and they would therefore not be attending the pig roast; then Joe Farinacci told him that his wife's girlfriend had been killed. (N.T. 11/19/13 at 192 - 93). He testified that in the early evening, he was contacted by the Monaca Police Department, and was asked to come down; he did so. (N.T. 11/19/13 at 193 – 94). He gave a statement to the police at that time. (N.T. 11/19/13 at 194). He set forth that he believed that he told the police essentially the same information as he was testifying to. (N.T. 11/19/13 at 195). He noted that after the interview, he went back to the office and told his girlfriend that he had been having a sexual relationship with the girl who had been murdered. (N.T. 11/19/13 at 195 - 96). He denied being at 935 Indiana Avenue on the date in question and denied killing Janet Walsh. (N.T. 11/19/13 at 196). He testified that he met with the police again three weeks later, and asserted that he did not hear from the police again until the summer of 2011. (N.T. 11/19/13 at 196 - 97).

Regarding his company, he asserted that the company filed for bankruptcy and closed. (N.T. 11/9/13 at 199 - 200). He denied hiding assets in bankruptcy. (N.T. 11/19/13 at 200). He noted that he married Dianne St. George in 1983; they divorced in 1999. (N.T. 11/19/13 at 205). He admitted that he became involved with Marge Lehocky in 1992 or 1993. (N.T. 11/19/13 at 205). He further noted that he met his current wife, Karen Fisher, after he was separated for six or eight months. (N.T. 11/19/13 at 205). He agreed that the police obtained a Buccal swab from him in 2011, and he was arrested in January of 2012. (N.T. 11/19/13 at 211 - 12).

On cross, the Defendant admitted that he had no emotional involvement with the victim. (N.T. 11/9/13 at 221). He agreed that the pig roast started at noon, and he didn't say a word to Larry Musgrave of Dianne St. George about the death of the victim during the pig roast. (N.T. 11/19/13 at 223 – 24). He agreed that when he was first interviewed by the police on September, 1979, he tried to keep his relationship with Janet a secret. (N.T. 11/19/13 at 224). He admitted that he lied when he told the police that he didn't know her well and that he "knew her to see her." (N.T. 11/19/13 at 225). He testified that the last time he was at her apartment was two, three or four weeks prior to date of her death. (N.T. 11/19/13 at 228 - 29).

He testified that Janet met up with him for drinks after the builders' meetings around two or three times. (N.T. 11/19/13 at 241). He agreed that he had told the police that he had sexual relations with the victim at her apartment on two or three occasions. (N.T. 11/19/13 at 249 - 51). He also agreed that for a good portion of thirty – four (34) years, he had probably been living lies. (N.T. 11/19/13 at 267). On re – direct, he pointed out that the relationship he had with his current wife was not borne from lies. (N.T. 11/19/13 at 267).

Jeff Bowman testified next on behalf of the Defendant. He asserted that he is employed by Corporate Security Investigations in Beaver County as the Director of Investigations. (N.T. 11/19/13 at 273). He noted that the post office in Monaca is located on Pennsylvania Avenue across from the Monaca Borough Building in Monaca. (N.T. 11/19/13 at 275). He further asserted that the National Bank was previously located next to the post office in Monaca. (N.T. 11/19/13 at 275 – 76). He testified that he drove from the location of the model home to the 935 Indiana Avenue address and determined that it was a driving distance of 5.7 miles and took him nine minutes and thirty – five (35) seconds to drive. (N.T. 11/19/13 at 283 – 84). He further noted that the driving distance from the Ella Street address where Scott Walsh lived and the 935 Indiana Avenue address was 1.4 miles and took him three minutes and forty – seven (47) seconds to drive. (N.T. 11/19/13 at 285 – 87).

Dr. Mark Perlin testified as an expert on behalf of the defense. He stated that he is the Chief Executive Officer and Chief Scientific Officer for Cybergenetics, a Pittsburgh – based biotechnology company. (N.T. 11/20/13 at 16). He testified that he received a Ph.D. in mathematics from the City University of New York, an M.D. from the University of Chicago, and a Ph.D. in computer science from Carnegie Mellon University. (N.T. 11/20/13/ at 16). He explained that Cybergenetics has developed a technology called "TrueAllele," which inputs electronic data from DNA instruments from crime labs, and then produces a genetic type or genotype that can be compared to other individuals. (N.T. 11/20/13/ at 17 – 18). He noted that Cybergenetics doesn't handle DNA samples directly; its computers process the sequences after the labs generate data from the samples. (N.T. 11/20/13 at 20 – 21). He explained that the computer system has a curve for each of fifteen different genetic test areas for each of the contributors, examines the data, and then tries out 10,000 different possibilities. (N.T.

62

11/20/13 at 31 - 32). He further explained that the system then makes comparisons against genetic types. (N.T. 11/20/13 at 32).

Regarding the case at hand, Dr. Perlin asserted that he reviewed the evidence regarding the vaginal swab, the oral swab, a pillow case, three different items from the handkerchief, fingernail clippings, a nightgown top, a bathrobe cord, five different items from the bathrobe, two swabs from a fitted bed sheet, and two swabs from a flat sheet. (N.T. 11/20/13 at 42 - 43). He noted that they received electronic files from the DNA genetic analyzer sent from the crime lab in Greensburg. (N.T. 11/20/13 at 43). He stated that after the data is inputted, it is reviewed to see if it is interpretable for genetic types. (N.T. 11/20/13 at 44). He testified that all of the DNA samples his lab reviewed in regard to this matter were highly degraded. (N.T. 11/20/13 at 50). He stated that he had prepared certain tables based upon his interpretation of the evidence. (N.T. 11/20/13 at 54).

Regarding the results, Dr. Perlin testified that the DNA tested from the nightgown top had a strong correlation to the Defendant of fifteen zeroes, indicating that the Defendant's DNA matched to the stain found on the nightgown top. (N.T. 11/20/13 at 59 - 60). Further, he noted that the bathrobe cord contained a strong association of seven zeroes, indicating that the Defendant's DNA stain was on the bathrobe cord. (N.T. 11/20/13 at 60). He further noted that there was DNA from a second contributor found in a female fraction on the bathrobe. (N.T. 11/20/13 at 60). Dr. Perlin further relayed that Items Q10 and Q11 on the flat sheet provided matches to the Defendant. (N.T. 11/20/13 at 64 – 65). Further, he noted that the found evidence of a match to the husband's DNA on the flat sheet as well. (N.T. 11/20/13 at 64 - 65). Regarding the nightgown top, he again noted that the computer statistic showed a match at the level of fifteen zeroes as to the Defendant's DNA. (N.T. 11/20/13 at 67). He also noted that with regard to the bathrobe cord, the computer found a match statistic in the tens of millions for the Defendant's DNA on the cord. (N.T. 11/20/13 at 67 – 68). He noted that on the flat sheet, the computer found a match to the Defendant at the 10,000 level and a match to the husband at the level of two zeroes. (N.T. 11/20/13 at 68). He further explained that the computer found a match of about ten million as to the Defendant's DNA on Item Q11 of the blue flat sheet, with a "very poor reliant statistic" to the husband at the level of just one zero in

63

that location. (N.T. 11/20/13 at 69). He again pointed out that the computer found a match to the Defendant in the level of 10,000 to the flat sheet. (N.T. 11/20/13 at 70). In sum, he testified that he found the Defendant's DNA in two areas of the bed sheet, on the back of the nightgown and on the robe tie. (N.T. 11/20/13 at 79). He agreed that the Defendant's assertions that he had sex with the victim on several occasions in the summer of 1979 could account for the Defendant's DNA being found in the locations where it was found. (N.T. 11/20/13 at 79). He further agreed that there was no test available to determine when the DNA was deposited. (N.T. 11/20/13 at 80). He asserted that transfer of DNA is promoted between surfaces that are wet. (N.T. 11/20/13 at 83). He noted that he set forth his conclusions to a reasonable degree of scientific certainty. (N.T. 11/20/13 at 91). He opined that there was no probative DNA evidence in the matter at hand. (N.T. 11/20/13 at 91).

On cross, Dr. Perlin admitted that he never looked at the physical evidence. (N.T. 11/20/13 at 96). He further agreed that he is not a forensic pathologist. (N.T. 11/20/13 at 96). He further agreed that back in 1979, alternate light sources were not available. (N.T. 11/20/13 at 99). He again noted that only the victim's DNA was found on the fitted sheet. (N.T. 11/20/13 at 117 – 18). Regarding the flat sheet, Dr. Perlin explained that it was ten times more probable that the husband contributed the DNA than a random individual. (N.T. 11/20/13 at 121). Regarding the nightgown top, Dr. Perlin explained that the match between the Defendant and the nightgown top is around a quadrillion times more probable than a random person having contributed their DNA. (N.T. 11/20/13 at 122 – 23). He agreed that with regard to the location on the nightgown top that was screened by serology, there was DNA from seminal fluid on the nightgown top that matched the Defendant. (N.T. 11/20/13 at 123). He noted that with regard to the bathrobe cord, one couldn't tell when the DNA was deposited there. (N.T. 11/20/13 at 125). Again, he reiterated that there was evidence of the Defendant's DNA on the nightgown top and the bathrobe cord. (N.T. 11/20/14 at 137). He again agreed that there was a positive association with the husband, Scott Walsh, and one spot on the flat sheet. (N.T. 11/20/13 at 147). Regarding the match with the Defendant and the DNA found on the nightgown, Dr. Perlin agreed that his chart displayed positive numbers demonstrating evidence of inclusion. (N.T. 11/20/13 at 149). He again agreed that the chart displayed positive numbers as to the DNA in

the bathrobe relating to the Defendant. (N.T. 11/20/13 at 149). He further noted that the report does not say the there was a definite match as to Scott Walsh and DNA found on the flat sheet. (N.T. 11/20/13 at 156). He agreed that with regard to the DNA found on the knot on the ligature around the victim's neck, no one other than the Defendant was close to being inclusive on the chart, but he further noted that the results were inconclusive. (N.T. 11/20/13 at 158). On re-direct, Dr. Perlin asserted that the charts did not contain all of the DNA that fluoresced in the case, but contained eighteen items which were selected by the Pennsylvania State Police serology lab for spermatozoa. (N.T. 11/20/13 at 160).

Trooper DeMaiolo again took the stand. On cross, he agreed that if Scott Walsh had cashed the check in Monaca, he would not have had to cross the Rochester – Monaca Bridge. (N.T. 11/20/13 at 173). On re – direct, he asserted that the check was issued through Scott Walsh's employer and was a paycheck, and the bank from which the money was drawn would have been the National Bank of Beaver. (N.T. 11/20/13 at 174). Further, he asserted that he was aware of the fact that Scott Walsh had done his banking at Equibank, and had signed the check on the back. (N.T. 11/20/13 at 175).

James Karwoski testified next on behalf of the Commonwealth. He noted that in the 1970's, he was employed at the Penn State Beaver Campus located in Beaver, Pennsylvania as an assistant professor of kinesiology and an athletic director and coach. (N.T. 11/20/13 at 176). He asserted that he was familiar with the Gee Bee Plaza, and recalled the Perkins restaurant there. (N.T. 11/20/13 at 176). He noted that with regard to the area between the Perkins and the Penn State Beaver Campus, students would travel frequently up and down the hill in between the Gee Bee Plaza and Penn State Beaver. (N.T. 11/20/13 at 176 – 77). He asserted that there were pathways there that the students would utilize. (N.T. 11/20/13 at 177).

### INSUFFICIENCY AND WEIGHT OF THE EVIDENCE CLAIMS

Regarding the Defendant's assertion that his Judgment of Acquittal should be granted based upon his insufficiency of the evidence claim, we note the following:

> In reviewing a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with

all reasonable inferences therefrom, the trier of fact could have
found that each and every element of the crimes charged was
established beyond a reasonable doubt. *Commonwealth v.
Randall*, 758 A.2d 669, 674 (Pa.Super.2000).

Comonwealth v. SMP, Inc., 88 A.3d 234, 236 (Pa. Super. 2014). Regarding the Defendant's

assertion that the verdict was against the weight of the evidence, we note:

> The standard of review for a weight of the evidence challenge is exclusively for
> the finder-of-fact who is free to believe all, part, or none of the evidence and to
> determine the credibility of the witnesses. Commonwealth v. Charlton, 902 A.2d
> 554, 561 (Pa. Super. 2006). A verdict is only against the weight of the evidence
> if it is so contrary to the evidence that it shocks one's sense of justice. Id.
> Appellant must also show that the trial court palpably abused its discretion in
> denying his weight of the evidence claim. Id.

Commonwealth v. Rakowski, 987 A.2d 1215, 1219 (Pa. Super. 2010), *appeal denied,* 608 Pa.

638, 9 A.3d 629 (2010). Third degree murder is defined as follows:

> **§ 2502. Murder**
>
> **(c) Murder of the third degree.**--All other kinds of murder shall be
> murder of the third degree. Murder of the third degree is a felony
> of the first degree.

18 Pa. C.S.A. § 2502(c). "Third-degree murder does not require the specific intent to kill,

though it does require malice." Commonwealth v. Street, 69 A.3d 628, 631 - 32 (Pa. Super.

2013) (citations omitted). "Third degree murder occurs when a person commits a killing which

is neither intentional nor committed during the perpetration of a felony, but contains the

requisite malice." Commonwealth v. Tielsch, 934 A.2d 81, 94 (Pa. Super. 2007), *appeal denied,*

597 Pa. 731, 952 A.2d 677 (2008) (quoting Commonwealth v. Kling, 731 A.2d 145, 147 (Pa.

Super. 1999), *appeal denied,* 560 Pa. 722, 745 A.2d 1219 (1999)). "Malice exists where there is

a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a

mind regardless of social duty, although a particular person may not be intended to be injured."

Kling, 731 A.2d at 147 – 48. "To sustain a conviction, however, the facts and circumstances which the Commonwealth must prove must be such that every essential element of the crime is established beyond a reasonable doubt." Tielsch, 934 A.2d at 94 (citation omitted).

In this case, taking the evidence in the light most favorable to the Commonwealth as the verdict winner, the testimony and evidence presented revealed the following:

In 1979, Catherine Janet Walsh, the victim in this matter, was twenty – three (23) years old, and a few months prior to her death, had moved into the bottom floor of a house at 935 Indiana Avenue in Monaca, PA. The victim had moved out of her home with her husband, Scott Walsh, on Ella Street, and had moved into the Indiana Avenue residence when they had separated. During the summer months of 1979, she engaged in a secret relationship with the Defendant. On September 1, 1979, the victim's parents, Pete and Mary Jane Caltury, became concerned about their daughter when she didn't show up for work, and went to her apartment and let themselves in the back door with their key. According to the testimony of Pete Caltury, when he entered into his daughter's bedroom, he observed a lump covered by a sheet on the bed. He walked over to the bed, pulled back the top sheet, and observed his daughter, the victim, lying face down in the bed with a bandanna tied around her neck, and her arms tied behind her back with a robe tie. Mr. Caltury ushered his wife out of the room, pulled the sheet back up over the victim, and called for help. At around 1:05 p.m., Officer Andrew Gall from the Monaca Police Department responded to the scene, where he observed the victim face down on the bed wearing a nightgown top, naked from the waist down, with a bandanna tied around her neck and her arms tied behind her back and the top sheet pulled over her. Detective Gall secured the scene and called the Pennsylvania State Police for help. Trooper Richard Matas arrived at the scene. The State Police packaged up and logged the evidence. The Coroner estimated her time of death to be around 5:00 a.m. on September 1, 1979, but stated that it could have been earlier. For a period of time while she lived at the Indiana Avenue residence, her friend, Barbara Cindrich resided with her. Barbara Cindrich had informed the police that the victim had been romantically involved with the Defendant.

The evening before her death, the victim went out with her friend, Margie Farinacci, who used to be her neighbor when she lived with Scott Walsh on Ella Street. The victim and

Ms. Farinacci went to dinner at Wendy's; then the victim went back home for a while, and then later that evening they went to the Top of the Mall, which was located in the Beaver Valley Mall. After they have drinks there, they went to the Getaway, which was located in the Gee Bee Plaza, where they meet up with Elaine DeLuco and Georgina Wilson. While at the Getaway, the victim danced with Robert McGrail. After the bar closes, Margie Farinacci and the victim go to Perkins, along with McGrail, and the victim asks McGrail to sit somewhere else, which he does. After they finished eating, both the victim and Farinacci got into their respective vehicles and drove home.

During the police investigation, the police discover that a checkbook belonging to Robert McGrail was discovered about a block from the victim's home. However, no other evidence tied McGrail to the scene of the victim's death. Regarding the victim's estranged husband, Scott Walsh, the testimony revealed that on the evening prior to the victim's death, he attended a Blackhawk football game, and then went to a bar on Route 51. After Walsh's friend began to have stomach pains, Walsh took him to the hospital, and they stayed there until around 1:00 a.m. After he goes home, Walsh gets a phone call from Irene Brenneman, who comes over to his residence and stays until around 2:30 a.m., and then leaves. She called him around 3:30 a.m. after she returned to her home. He then went back to sleep.

The house where the victim and Scott Walsh had lived on Ella Street was built by Colony Builders, which was a company owned by the Defendant. The victim's friend, Margie Farinacci, worked for Colony Builders as a cleaning lady. The victim visited Farinacci at work on occasion, and through those means, she was introduced to the Defendant. The Defendant and the victim engaged in a sexual relationship, in which he would visit her apartment at 935 Indiana Avenue late at night, enter through the back door, and then leave after having sex and talking for a while. He would then return to the model home on Pleasant Drive, where he was staying. The relationship was kept a secret. At the time of this relationship, the Defendant was estranged from his wife Ellen, and was dating another woman, Dianne St. George, whom he later married. In his interview with the police, the Defendant admitted to having a sexual relationship with the victim, but had claimed that the last time he had a sexual encounter with her was three or four weeks prior to her death.

On September 1, 1979, the Defendant hosted a pig roast for his employees. On August 31, 1979, he had stayed at the Colonial Builders model home in Center Township with his best friend and business partner, Larry Musgrave, Goergeann Musgrave, and his girlfriend, Dianne St. George. On that night, the Musgraves slept on the floor of the living room of the model home and the Defendant slept in the waterbed with Dianne St. George. He claimed to have gone to bed that night at around 12:00 a.m. or 1:00 a.m., and further asserted that he got up at around 5:30 a.m. or 6:00 a.m. to start the fire and put the pig on the spit. He did not tell Dianne St. George or Larry Musgrave about the fact that he was seeing the victim until after he had been interviewed by the police on September 1, 1979. When he was first interviewed by the police on September 1, 1979, at first he told them that he only knew Janet Walsh to see her; later in the interview he admitted to having a sexual relationship with her. At first, he told the police that he had two to three sexual encounters with the victim; he later stated that he had three or four sexual encounters with her. Also, he told the police that the last time he saw the victim was around three or four weeks prior to September 1, 1979, and he further asserted that the last time he had talked to her on the phone was a week or a week and half prior to that date.

The police did not have any leads for several years. The photos of the crime scene placed into evidence demonstrated that at the time of her death, the victim was found wearing a nightgown top face down on her bed with her buttocks exposed and her hands tied behind her back with a bathrobe tie; there was a bandanna tied tightly around her neck. The cause of death was strangulation. The Defendant's seminal fluid was found on the bathrobe cord binding her hands, on back portion of the nightie the victim was wearing, and on the flat sheet that was lying partially on top of the victim in the area of the nightie when she was found. In 2010, the police decide to reopen the investigation. The evidence is tested at the Pennsylvania State Police Crime Lab, and the scientists found DNA evidence of an unknown male from seminal fluid on the back of the victim's nightgown, the robe tie binding her hands together, and the top sheet that was covering up the victim. The State Police Crime Lab later determined that the profile from the seminal stains found on the robe tie, top sheet, and nightgown top matched the profile from the rim of the cups utilized by the Defendant.

69

Regarding the testimony of the expert witness for the defense, we note that the jury was free to believe all, none, or some of his testimony. We note that Dr. Perlin's testimony did not refute the evidence that the Defendant's semen was found on the flat sheet, the nightgown top, and the robe tie that bound the victim's hands. Regarding the testimony of the Defendant's alibi witnesses, Dianne St. George, Georgeann Musgrave, and Larry Musgrave, we again note that the jury was free to believe all, none, or some of their testimony. The jury may simply have chosen not to believe their testimony that they did not notice anyone leave the model home between the hours of 1:00 a.m. and 5:30 or 6:00 a.m. on September 1, 1979. Alternatively, the jury may have simply concluded, based upon the testimony of record, that the witnesses were asleep when the Defendant left the residence where they were spending the night, and went to the victim's apartment. Regarding the Defendant's testimony, the jury did not find credible his assertion that the last time he had sexual relations with the victim was a few weeks earlier. Further, the jury determined that the Defendant acted with malice due to the fact that the victim died of strangulation because of the bandanna tied tightly around her neck while her hands were tied behind her back at the wrist area. The Defendant admitted to being involved in a secret sexual relationship with the victim, and admitted that he had sex with her late at night at her apartment at 935 Indiana Avenue.

It was later determined by Crime Lab the semen found on the nightgown top, robe tie around the victim's wrists, and flat sheet covering the victim matched the Defendant's DNA. The Defendant's DNA was taken from drinking cups he utilized and threw away at the Borough building. Importantly, the serologist noted that the tested areas of the robe tie and nightgown top, and the area on the flat sheet covering the victim, had a 4+ rating for the amount of semen found there; this indicated that there was a large amount of semen present. Furthermore, the only DNA found on the nightgown top and robe tie matched the Defendant. Given the location of the semen on the bed sheet that covered most of the victim's body, and the fact that the Defendant's semen was also found on the nightgown and the robe tie binding her hands behind her back, the Commonwealth proved beyond a reasonable doubt that the Defendant was the perpetrator and killed the victim with malice. Each and every element of the crime of third

70

degree murder was proven by the Commonwealth beyond a reasonable doubt. The verdict was not against the weight of the evidence because it does not shock the Court's sense of justice.

## ALLEGED ERROR REGARDING THE TRIAL COURT'S DENIAL OF THE DEFENDANT'S MOTION TO SUPPRESS THE ALLEGED SEIZURE OF THE CUP UTILIZED BY THE DEFENDANT

The Defendant asserts that the trial court erred in failing to suppress evidence regarding the identity of the Defendant as the perpetrator stemming from the collection of the drinking cups utilized by the Defendant. This issue was thoroughly discussed in our Opinion dated November 4, 2013. Regarding the assertion that Vicki Reddigner was acting as an agent of the police when she observed the Defendant drinking from the cups and then removed the cups from the garbage after he had left, we note that the Defendant's contention is of no moment. As discussed in our Opinion, no seizure occurred because the drinking cups had been thrown out by the Defendant. The issue as to whether Vicki Reddinger was or was not an "agent" of the Commonwealth therefore is of no consequence.

## ALLEGED ERROR FOR FAILING TO DISMISS THE CASE FOR ALLEGED PRE-ARREST DELAY

The Defendant contends that he has suffered prejudice due to the fact that the crime occurred on September 1, 1979, and he was not charged with homicide until January of 2012. We note:

> While there is no statute of limitations for murder, 42 Pa.C.S.A. § 5551, we have applied the high Court's directive that certain pre – arrest delay may violate a defendant's due process rights since our decision in *Commonwealth v. Daniels,* 480 Pa. 340, 390 A.2d 172 (1978). However, a defendant's due process right against pre – arrest delay is limited; law enforcement is not required to make an arrest as soon as enough evidence has been accumulated to constitute probable cause, or even proof beyond a reasonable doubt. *Id.* at 355–56, 390 A.2d at 180–81. Indeed, there is no right to be arrested or right to prosecution. *Id.* (citing *Hoffa v. U.S.,* 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), and *U.S. v.*

71

_Lovasco,_ 431 U.S. 783, 794, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)).
Only if a defendant can show "that the passing of time caused
actual prejudice and that the prosecution lacked sufficient and
proper reasons for postponing the prosecution," _Snyder,_ 552 Pa.
at 54, 713 A.2d at 601, is he entitled to relief. As such, a due
process violation will be found only in "extreme cases" when
there are "no valid reasons" for the delay. _Snyder,_ 552 Pa. at 44,
713 A.2d at 605.

Commonwealth v. Simpson, 620 Pa. 60, 66 A.3d 253, at 283 (2013). "To prevail on a claim of violation of due process based on pre-arrest delay, a defendant must first establish that the delay caused him actual prejudice." Tielsch, 934 A.2d at 91 − 92. No pre − arrest delay occurred in this matter because the Defendant was charged with homicide within a reasonable time after the police identified him as the alleged perpetrator. The Complaint in this matter was filed on January 29, 2012. The investigating officers did not know that semen was available to be tested until 2010, when the lab found semen on the back of the nightgown, the robe tie, and the flat bed sheet. Furthermore, there was no match between the semen and any of the suspects until DNA obtained from the drinking cups utilized and thrown out by the Defendant in August of 2011 were tested by the crime lab and a match was found. There is no evidence of record to suggest that the Commonwealth was purposefully dilatory or that the Defendant suffered prejudice.

## ALLEGED ERROR REGARDING THE TRIAL COURT'S SUSTAINING OF THE COMMONWEALTH'S OBJECTION TO DR. PERLIN'S TESTIMONY AS TO WHAT THE STATE POLICE SHOULD HAVE DONE

The Defendant alleges that the trial court erred in refusing to allow Dr. Perlin to testify regarding charts that he made that would purportedly clarify his assertion that the State Police had a limited scope in their investigation. We incorporate by reference the portion of the Opinion setting forth the summary of Dr. Perlin's testimony as set forth _supra._ On cross examination, Dr. Perlin was questioned regarding charts he prepared concerning associations with the victim's death. After he was questioned on cross examination regarding the match

72

statistics on the chart that associates with the victim's death, the Defendant asserted that the charts were not complete and further noted that his company ran a lot more confirmatory runs. (N.T. 11/20/13 at 160). Thus, he noted that the results were partial. (N.T. 11/20/13 at 160). The charts that were discussed displayed a distribution relating to certain potential suspects and the DNA found on the items tested by the State Police Lab. When Dr. Perlin began testifying as to what should have been done in order for the police to have conducted a full and thorough analysis of the case, the Commonwealth objected, noting that it was proper for the witness to testify regarding the DNA results and the analysis, and not about what the police and / or the lab should have done. (N.T. 11/20/13 at 161). Dr. Perlin's testimony regarding his opinion as to what actions the police and / or lab should have taken was far beyond the scope of cross examination. Further, it was beyond the scope of his expertise as he is not a criminal investigator or a forensic pathologist. Moreover, it was speculative in nature. As such, the testimony was properly excluded.

## ALLEGED ERROR REGARDING THE QUESTIONING OF RICHARD NEFF

We incorporate by reference the summation of Richard Neff's testimony as set forth *supra*. Neff testified that he came into contact with fellow realtors, lenders, title insurance agents, and also was part of a social circle of people who knew the Defendant. (N.T. 11/18/13 at 94 - 95). He testified that over the years, he had the occasion to speak to those individuals about the Defendant's reputation for being a truthful individual. (N.T. 11/18/13 at 95). He noted that amongst the realtors in Beaver County, the Defendant had an excellent reputation for truthfulness and honesty, and for being a law abiding citizen. (N.T. 11/18/13 at 95). Furthermore, Neff relayed that the Defendant had a reputation for being a non – violent person. (N.T. 11/18/13 at 96 – 97).

On cross, Neff admitted that he had been living in Florida for the last few years. (N.T. 11/18/13 at 97). He agreed that he was the Defendant's attorney for a period of time. (N.T. 11/18/13 at 99). Neff admitted that he was not aware of the fact that when he met the Defendant, the Defendant was having secret relationships outside of marriage. (N.T. 11/18/13 at 104 - 05). Neff admitted that he was aware of the fact that the Defendant had gone through

a bankruptcy with Colony Square. (N.T. 11/18/13 at 106). However, he denied knowledge of the Defendant hiding assets during the bankruptcy. (N.T. 11/18/13 at 106).

The Defendant's assertion that the Commonwealth's questioning of witness Richard Neff is improper is utterly without merit. The defense opened the door and placed at issue the Defendant's reputation for truthfulness. The Commonwealth represented that it did inform the defense about witness Doug Fodrey, who was on the witness list, and who purportedly stated that the Defendant had hid vehicles during the company bankruptcy proceedings. Defense counsel opened the door to questions about the Defendant's truthfulness when he asked Neff about his knowledge of the Defendant's reputation for truthfulness in the community. As such, the questioning was proper and did not unfairly characterize the testimony of the witness. The trial court did not err in overruling the Defendant's objections.

## ALLEGED ERRORS REGARDING THE TESTIMONY OF DETECTIVE ANDREW GALL

Regarding the Defendant's alleged points of error concerning Detective Andrew Gall, we incorporate by reference Detective Gall's testimony as set forth *supra*. Regarding a question posed by the prosecutor as to whether the statements made by Scott Walsh were consistent over the years, Detective Gall relayed that the only difference in his statements was that in the first interview, he neglected to mention Ilene Brenneman. (N.T. 11/14/13 at 63). Further, he noted that Walsh had always told the police that he cashed his checks at the Equibank in Beaver. (N.T. 11/14/13 at 65). Further, Detective Gall asserted that Walsh had told the police from the very beginning that he and the victim were separated. (N.T. 11/14/13 at 66). Further, he noted that when the marital home on Ella Street was sold, Walsh split the proceeds with the Caltury family. (N.T. 11/14/13 at 66). He testified that Walsh provided a Buccal swab, and after Walsh's DNA was compared to the DNA found on the nightgown, robe tie and top sheet, it was determined that the DNA found in those locations did not match Walsh's DNA. (N.T. 11/14/13 at 67).

These statements by Detective Gall did not improperly "bolster" the credibility of Scott Walsh; they are mere statements of fact based upon Detective Gall's investigation of the matter. The jurors were informed when given their instructions that they are the sole fact – finders and that they alone determine credibility. This did not infringe upon the jury's function

74

as fact – finder. Detective Gall did not improperly vouch for Scott Walsh. Importantly, these issues are waived by the failure of defense counsel to object, with the exception of the objection as to the question regarding whether Walsh's statements had ever been inconsistent.

Regarding the Defendant's assertion that the Court improperly elicited the testimony of Detective Andy Gall in a manner that rehabilitated him with respect to taking certain statements, we note that the Court asked questions in order to clarify for the jury the manner by which the Detective took statements. The Court first asked Detective Gall to explain how the statements were taken, and Detective Gall agreed that the statements were taken on a small cassette, which was placed in the middle of the room with police officers around and no stenographer present. (N.T. 11/14/13 at 116 – 17). He further agreed that the cassette was taken to the District Attorney's office and was transcribed by someone who was not a stenographer. (N.T. 11/14/13 at 117 – 18). Also, he agreed that the transcriptions contained gaps and explained that they were used to as a guide for the police officers to be able to repeat what was said. (N.T. 11/14/13 at 118). The Court's questioning of Detective Gall served only to aid the jury in understanding the means by which statements were recorded by the police in 1979. Further, we note that defense counsel did not object to the Court's questions; as such, the Defendant has waived this issue.

### ALLEGED ERROR REGARDING EXLUDING THE PROFERRED TESTIMONY OF LEO BIANCO

Regarding the Defendant's assertion that the Court erred in excluding the proffered testimony of Leo Bianco, who had purportedly given a statement that he had moved the top sheet covering the victim's body, we note that this contention is meritless. Defense counsel asserted that the January 24, 2001 Monaca police report sets forth that Leo Bianco had stated that on September 1, 1979, he was summoned by Peter Caltury around noon to go to the victim's residence. (N.T. 11/18/13 at 275). Further, defense counsel represented that Bianco then stated that Caltury had told him that he thought the victim was dead: he then went into the bedroom, and after observing the victim covered with a sheet, he uncovered the victim and observed that her hands were tied behind her back. (N.T. 11/18/13 at 275.) According to

75

defense counsel, Bianco had asserted that he then touched her lower back, noticing that she was cold and stiff, and then re – covered the victim as he found her. (N.T. 11/18/13 at 275). Defense counsel asserted that he planned to call Officer Young from the Monaca Police Department for the purpose of setting forth the statements of Leo Bianco.

The Court disallowed the testimony because it was hearsay. Further, the Commonwealth pointed out that Bianco is deceased, and also asserted that there was another statement taken by Leo Bianco in which he does not state that he removed the top sheet from the victim. The Court did not err in determining that the statements were hearsay, as they were clearly being offered for the truth of the matter asserted and not merely for rebuttal purposes.

## ALLEGED ERROR REGARDING THE JURY INSTRUCTIONS

Regarding the Defendant's claim that the Court erred in failing to provide with jury with copies of all of the written instructions requested, we note the following regarding Superior Court review of claims involving errors in instructing the jury:

> A trial judge has great discretion in instructing a jury, as long as the instructions fully convey the applicable rules of law in the case. _Bailey v. Pennsylvania Elec. Co.,_ 409 Pa.Super. 374, 390, 598 A.2d 41, 49 (1991), allocatur denied, 534 Pa. 645, 627 A.2d 177 (1993). Therefore, our scope of review is limited to determining whether the trial judge "committed a clear abuse of discretion or error of law controlling the outcome of the case." _Stewart v. Motts,_ 539 Pa. 596, 606, 654 A.2d 535, 540 (1995). We consider the instructions in their entirety to determine whether the trial judge committed an error, and, if so, whether the error was prejudicial to the complaining party. _Bailey,_ 409 Pa.Super. at 390-91, 598 A.2d at 49.

Valentine v. Acme Markets, Inc., 687 A.2d 1157, 1161 (Pa. Super. 1997). In this matter, the Defendant's argument is specious. The Court provided the jury with copies of the instructions relating to the elements of the crimes charged, as is this Court's practice. The Court instructed the jury in Court as to all relevant charges. As such, the Court did not err in disallowing the jury to receive copies of written instructions other than those reciting the elements of the offenses charged.

For the foregoing reasons, the Defendant's judgment of sentence should be affirmed.

# IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY PENNSYLVANIA

## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :

   :

       vs.                 :       No. 580 of 2012

   :

GREGORY SCOTT HOPKINS         :


## ORDER

**H. KNAFELC, J.**                                **August 26, 2014**


AND NOW, to wit, this Court submits the attached Opinion in support of affirmance of the Judgment of Sentence in this matter.

BY THE COURT:

BY THE COURT

2014 AUG 26 A 9: 00

HARRY E. KNAFELC
JUDGE

BEAVER COUNTY
PENNSYLVANIA

AUG 26 AM 9: 59

JUDY H. ENSLEN
CLERK OF COURTS